633 S.E.2d 311

STATE of West Virginia, Plaintiff
Below, Appellee

v.

James Allen MECHLING, Defendant
Below, Appellant.

No. 32873.

Supreme Court of Appeals of
West Virginia.

Submitted April 12, 2006.

Decided June 30, 2006.

Marcia Ashdown, Prosecuting Attorney, Morgantown, of Appellee.

Joseph M. Sellaro, Esq., Sellaro & Sellaro, Morgantown, for Appellant.

STARCHER, J.:

This is an appeal of a domestic battery conviction from the Circuit Court of Monongalia County. We are asked to examine whether the circuit court erred in permitting the admission of statements made by the victim to three individuals—statements indicating that the victim was battered by the defendant—when the victim did not appear and testify at the defendant's trial.

As set forth below, we find that the statements made by the victim were improperly admitted in violation of the Confrontation Clause of the Sixth Amendment to the *United States Constitution* and Article III, Section 14 of the *West Virginia Constitution.*

I.

*Facts & Background*

The State contends that on March 20, 2004, defendant James Allen Mechling committed misdemeanor domestic battery against his girlfriend, victim Angela Thorn, in violation of *W.Va.Code,* 61–2–28(a) [2001].[1] To establish guilt under that section, the State was specifically required to prove that the defendant did "intentionally make[ ] physical contact of an insulting or provoking nature" with a family or household member. The statute stated:

> (a) Domestic battery.—Any person who unlawfully and intentionally makes physical contact of an insulting or provoking nature with his or her family or household member or unlawfully and intentionally causes physical harm to his or her family or household member, is guilty of a misdemeanor and, upon conviction thereof, shall be confined in a county or regional jail for not more than twelve months, or fined not more than five hundred dollars, or both.

The defendant was tried and convicted under this statute in magistrate court, and then appealed the conviction to the circuit court. In a *de novo* bench trial in the circuit court on November 8, 2004, the defendant was once again convicted of domestic battery.

The victim, Ms. Thorn, did not appear at either of the defendant's trials. The circuit clerk issued subpoenas for the victim, upon the request of the State. However, it appears that the circuit clerk mailed the subpoenas, rather than formally serving the subpoenas upon Ms. Thorn. The State was apparently unable to call the victim to testify.

Furthermore, no witnesses testified before the circuit court that they saw the defendant "intentionally make physical contact" with the victim. Instead, the State established that the defendant battered the victim through the testimony of three individuals who heard the victim say that the defendant had struck her.

Witness Ralph Alvarez testified that, on March 20, 2004, he was out in his yard by his garage working on his car. Several times he heard a man and woman yelling and arguing, but continued working. However, when Mr. Alvarez heard a child crying, he walked out

---

1. *W.Va.Code,* 61–2–28 was amended by the Legislature on March 13, 2004, and the amendments took effect ninety days later. *See 2004 Acts of the Legislature,* ch. 85. These amendments do not, however, affect the appellant's claims.

into his yard and saw—approximately seventy to eighty yards away on the side of a nearby road—a young woman (later identified as Ms. Thorn) getting up off of the ground. Mr. Alvarez testified that his view of the scene was partly obstructed by a tree, so he took a few more steps across his yard and saw the defendant, James Mechling. Between the defendant and Ms. Thorn was a baby buggy with defendant Mechling's and Ms. Thorn's infant daughter.

Mr. Alvarez stated that he perceived that the defendant was standing up straight, facing across the baby buggy as Ms. Thorn was getting up off the ground. Mr. Alvarez testified that he saw the defendant "take a swing" at Ms. Thorn, but that his view was still partly obstructed by the tree:

> I couldn't tell whether it was a punch, a slap. I could just tell he was swinging— he'd swung at her or something in front of him, the way the tree was situated.... I really didn't pay attention to it when I seen what was going on. I just knew there was something happening that shouldn't be.

Trial Tr. at 8–9. Mr. Alvarez could not, however, say whether the defendant's swing "connected with" Ms. Thorn, stating, "I did not physically see him make physical contact with her." Trial Tr. at 7, 13–14, 18.

Mr. Alvarez yelled at the defendant to stop, and the defendant did. Mr. Alvarez went to his daughter's nearby trailer and asked her to call the sheriff's department, and then walked back across the yard toward the defendant and Ms. Thorn. Before Mr. Alvarez reached the defendant, a vehicle pulled to the side of the road and the defendant climbed in and fled the scene.

Over defense counsel's objection, Mr. Alvarez was permitted to testify about his conversation with Ms. Thorn. Mr. Alvarez stated that:

She said, he hit me in the head and I've got a knot on my head, and I asked her if she was okay, and she said, yes, she would be okay.

Trial Tr. at 11. Mr. Alvarez comforted Ms. Thorn until two sheriff's deputies arrived shortly thereafter.

Deputies Robert Fields and Thornton Merrifield testified that they received a call of a domestic dispute in progress around 9:30 in the morning, and that they arrived on the scene "within 15 minutes." When they arrived at the scene they found Ms. Thorn to be crying and "really shook up." Over the objections of defense counsel, the sheriff's deputies testified to their conversation with Ms. Thorn. Deputy Fields stated that Ms. Thorn "told me that her head hurt from where she was punched in the head." Trial Tr. at 22. Deputy Merrifield stated:

> Deputy Merrifield: [Ms. Thorn] said she'd been struck in the head twice, and she felt her head, and I went ahead and felt, and there was two knots on the right side of her head.
>
> Prosecutor: And she attributed those knots to the defendant's actions?
>
> Deputy Merrifield: Yes, ma'am.

Trial Tr. at 27. As a result of Ms. Thorn's statements identifying the defendant as her assailant, the deputies testified they sought a warrant for the arrest of the defendant.

The defendant invoked his constitutional right not to testify.

■ At the close of the trial, the circuit court found, beyond a reasonable doubt and "upon the basis of the testimony" that the defendant was guilty of domestic battery for striking the victim "one time in the head." The circuit court sentenced the defendant to be incarcerated in the regional jail for six months, and imposed a $100.00 fine. The circuit court formalized its decision in an order dated November 19, 2004.[2]

2. At the November 8, 2004 trial, the circuit court indicated that the effective sentence date was the date of the defendant's arrest, April 12, 2004. Accordingly, the six-month sentence was effectively discharged as of October 6, 2004, because the defendant had been in pretrial incarceration pending the resolution of several felony charges

including DUI Resulting in Death, Fleeing the Scene, and Forgery of Public Documents.

This does not, however, mean that the defendant's appeal is pointless or moot. If the defendant is subsequently convicted for additional acts of domestic violence, in this state or another state, a court may be empowered to impose a greater penalty upon the defendant. See, e.g.,

The defendant now appeals his conviction and the court's November 19, 2004 order.

## II.

### Standard of Review

 Our standard of review of the circuit court's judgment after a bench trial was set out in Syllabus Point 1 of *Public Citizen, Inc. v. First Nat. Bank in Fairmont,* 198 W.Va. 329, 480 S.E.2d 538 (1996):

In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

 The defendant, however, alleges that constitutional error occurred in the admission of Ms. Thorn's statements through the testimony of Mr. Alvarez and Deputies Fields and Merrifield. We have stated that the "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syllabus Point 5, *State ex rel. Grob v. Blair,* 158 W.Va. 647, 214 S.E.2d 330 (1975). *In accord,* Syllabus Point 14, *State v. Salmons,* 203 W.Va. 561, 509 S.E.2d 842 (1998). "An error in admitting plainly relevant evidence which possibly influenced the jury [or a trial judge] adversely to a litigant cannot ... be conceived of as harmless." *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). " 'Errors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction.' " *State v. Jenkins,* 195 W.Va. 620, 629, 466 S.E.2d 471, 480 (1995) (*quoting,* Syllabus Point 20, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974)). Moreover, once an error of constitutional dimensions is shown, the burden is upon "the bene-

ficiary of a constitutional error"—usually the State—"to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. 824.

With these standards in mind, we consider the defendant's arguments.

## III.

### Discussion

The defendant argues that his rights under the Confrontation Clause—set forth in the Sixth Amendment to the *United States Constitution* and in Section 14 of Article III of the *West Virginia Constitution*—were violated when the circuit court, over defense counsel's objection, permitted three witnesses to testify regarding oral statements made by the victim accusing the defendant of a crime when the victim did not appear for trial.

The Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* guarantee an accused the right to confront and cross-examine witnesses. The Confrontation Clause contained in the Sixth Amendment provides: "In all criminal prosecutions, the accused shall ... be confronted with the witnesses against him[.]" Likewise, the Confrontation Clause contained in the *West Virginia Constitution,* Section 14 of Article III, provides that in the "[t]rials of crimes, and misdemeanors ... the accused shall be ... confronted with the witness against him[.]"

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court decided that the Confrontation Clause allowed the out-of-court statement of a witness to be admitted against an accused if it was shown that the witness was unavailable for trial, and that the witness's statement bore "adequate 'indicia of reliability.' " 448 U.S. at 66, 100 S.Ct. 2531.

This Court has grappled with the *Roberts* decision in three cases. We first adopted the test set forth in *Roberts* in *State v. James*

---

*W.Va.Code,* 61–2–28(c) (increasing the penalties for second offense of domestic assault or domestic battery) and –28(d) (making third or subsequent domestic assault or domestic battery a felony) [2004].

*Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), stating at Syllabus Point 2:

> The two central requirements for admission of extrajudicial testimony under the Confrontation Clause contained in the Sixth Amendment to the United States Constitution are: (1) demonstrating the unavailability of the witness to testify; and (2) proving the reliability of the witness's out-of-court statement.

In *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995), we expanded our holding in *James Edward S.* to state that no independent assessment of the reliability of the witness's out-of-court statement was necessary if the statement was admissible because of an exception to the hearsay rules. We stated, in Syllabus Point 6 of *Mason*, that:

> For purposes of the Confrontation Clause found in the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution, no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception.

And finally, in *State v. Kennedy*, 205 W.Va. 224, 517 S.E.2d 457 (1999), we concluded that the Confrontation Clause test espoused in *Roberts* applied only to out-of-court statements made by a witness in a prior judicial proceeding. We therefore modified our holding in *James Edward S.*, stating in Syllabus Point 2:

> We modify our holding in *James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), to comply with the United States Supreme Court's subsequent pronouncements regarding the application of its decision in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), to hold that the unavailability prong of the Confrontation Clause inquiry required by syllabus point one of *James Edward S.* is only invoked when the challenged extrajudicial statements were made in a prior judicial proceeding.

Subsequent to our three decisions interpreting and applying *Roberts*, the U.S. Supreme Court issued *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford*, the appellant argued that the test adopted by the *Roberts* Court "strays from the original meaning of the Confrontation Clause" and urged the Court to reconsider its holding. 541 U.S. at 42, 124 S.Ct. 1354.

The U.S. Supreme Court examined the common law and history surrounding the Confrontation Clause, and concluded in *Crawford* that *Roberts* should be overruled. The Court stated in *Crawford* that, contrary to *Roberts:*

> ... the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts ... As the English authorities above reveal, the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine.

541 U.S. at 53–54 (citation omitted). The Court therefore set forth the following summation of the law behind the Confrontation Clause:

> Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.

541 U.S. at 59, 124 S.Ct. 1354.

The central holding of *Crawford* is that the testimonial character of a witness's statement separates it from other hearsay statements, and determines whether the statement is admissible at trial or not because of the Confrontation Clause. The Confrontation Clause is a rule of procedure, not a rule of evidence. "If there is one theme that emerges from *Crawford*, it is that the Confrontation Clause confers a powerful and fundamental right that is no longer subsumed by the evidentiary rules governing the admission of hearsay statements." *United States v. Cromer*, 389 F.3d 662, 679 (6th Cir.2004).

The Court acknowledged that its reasoning in *Roberts* was flawed because it allowed a

jury to hear evidence that was untested by the adversarial process, and admission of the evidence was based on a mere judicial determination of reliability, a determination usually made under the rules of hearsay. 541 U.S. at 62, 124 S.Ct. 1354. The Court determined that the Framers of the *Constitution* did not mean "to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" 541 U.S. at 61, 124 S.Ct. 1354. The Court therefore rejected the reasoning of *Roberts*, stating:

> Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.

541 U.S. at 62, 124 S.Ct. 1354. Because of the unpredictability of the "reliability" concept espoused by the *Roberts* Court, as well as "its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude," 541 U.S. at 63, 124 S.Ct. 1354, the Court concluded that *Roberts* was "a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion." 541 U.S. at 67, 124 S.Ct. 1354. The Court conceded that lower courts relying on *Roberts* were likely acting in good faith when they found a witness's out-of-court statement to be admissible against an accused merely because it was reliable, but said:

> The Framers, however, would not have been content to indulge this assumption. They knew that judges, like other government officers, could not always be trusted to safeguard the rights of the people[.] ... They were loath to leave too much discretion in judicial hands.

541 U.S. at 67, 124 S.Ct. 1354. The Court therefore overruled its reasoning in *Roberts*.

■ The law of *Crawford* is clear: the Confrontation Clause of the Sixth Amendment to the *United States Constitution*, and of Section 14 of Article III of the *West Virginia Constitution*, bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

Furthermore, *Crawford* explicitly overrules *Ohio v. Roberts*, thereby undermining the fundamental holdings of at least three Confrontation Clause cases of this Court that were directly based upon that case. Accordingly, to the extent that *State v. James Edward S., supra, State v. Mason, supra,* and *State v. Kennedy, supra,* rely upon *Ohio v. Roberts, supra,* and permit the admission of testimonial statements by a witness who does not appear at trial, regardless of the witness's unavailability for trial and regardless of whether the accused had a prior opportunity to cross-examine the witness, this Court overrules those cases.

■ *Crawford* makes clear that only "testimonial statements" cause the declarant to be a "witness" subject to the constraints of the Confrontation Clause. Non-testimonial statements by an unavailable declarant, on the other hand, are not precluded from use by the Confrontation Clause. While the Court in *Crawford* did not clearly define the term "testimonial statements," it did leave some clues as to the types of witness declarations which might fit the meaning of "testimonial statements:"

> Various formulations of this core class of "testimonial" statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[;] extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[;] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any

definition—for example, *ex parte* testimony at a preliminary hearing.

Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.

541 U.S. at 51–52, 124 S.Ct. 1354 (quotations and citations omitted).

The *Crawford* Court, however, "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'" 541 U.S. at 68, 124 S.Ct. 1354.[3]

In *Davis v. Washington*, 547 U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the U.S. Supreme Court returned to the *Crawford* decision and, for the first time, began to establish some parameters for the term "testimonial." The Court again recognized that it could not produce an "exhaustive classification of all conceivable statements" that were either testimonial or non-testimonial. 547 U.S. at ——, 126 S.Ct. 2266 (Slip. Op. at 7). But, within the context of the fact patterns before the Court, the *Davis* Court crafted some diffuse guidelines which, because of the Court's circumlocution, we must now attempt to distill into practical rules.

The *Davis* case was actually a consolidation of two separate domestic violence criminal convictions. In these cases, the Court was asked to determine the effect of the Confrontation Clause upon two forms of out-of-court witness statements made to law enforcement personnel that, when the witness did not appear for trial, were used against the accused: a recording of a 911 call by the crime victim as the crime was occurring; and the testimony of a police officer relating his conversation with the victim some time after arriving at the crime scene.

In the first case, Adrian Martell Davis challenged his conviction for felony violation of a domestic no-contact order involving his former girlfriend. At trial, the victim did not testify. Instead, the prosecution admitted a recording of the victim's 911 call. In a colloquy with a 911 operator, the former girlfriend stated that she was being beaten, and identified Davis as her assailant.[4]

In the second case, *Hammon v. Indiana*,[5] police officers responded to a reported domestic disturbance at the home of Herschel and Amy Hammon. They found Amy alone on the front porch, but she told them that "nothing was the matter." 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 4). The officers

**3.** Other clues to the meaning of the "testimonial statements" can be found in *Lee v. Illinois*, 476 U.S. 530, 540, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) ("The Confrontation Clause ... ensur[es] that convictions will not be based on the charges of unseen and unknown—and hence unchallengable—individuals."); *Ohio v. Roberts*, 448 U.S. at 78, 100 S.Ct. 2531 (Brennan J., dissenting) ("Historically, the inclusion of the Confrontation Clause in the Bill of Rights reflected the Framers' conviction that the defendant must not be denied the opportunity to challenge *his accusers* in a direct encounter before the trier of fact."); *California v. Green*, 399 U.S. 149, 179, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring) ("[T]he Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses."); and *Bruton v. United States*, 391 U.S. 123, 138, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (Stewart, J., concurring) ("[A]n out-of-court accusation is universally conceded to be constitutionally inadmissible against the accused.").

**4.** The conversation with the 911 operator began as follows:

911 Operator: Hello.
Complainant: Hello.

911 Operator: What's going on?
Complainant: He's here jumpin' on me again.
911 Operator: Okay. Listen to me carefully. Are you in a house or an apartment?
Complainant: I'm in a house.
911 Operator: Are there any weapons?
Complainant: No. He's usin' his fists.
911 Operator: Okay. Has he been drinking?
Complainant: No.
911 Operator: Okay, sweetie. I've got help started. Stay on the line with me, okay?
Complainant: I'm on the line.
911 Operator: Listen to me carefully. Do you know his last name?
Complainant: It's Davis.
911 Operator: Davis? Okay, what's his first name?
Complainant: Adrian
911 Operator: What is it?
Complainant: Adrian.
911 Operator: Adrian?
Complainant: Yeah.
911 Operator: Okay. What's his middle initial?
Complainant: Martell. He's runnin' now.
*Davis*, 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 2).

**5.** The underlying case is *Hammon v. State*, 829 N.E.2d 444 (Ind.2005).

entered the house and found glass broken on the front of a gas heating unit, and flames coming out. Herschel, who was in the kitchen, told officers that he and his wife had been in an argument, but that it "never became physical." The officers kept the Hammons separated, and one officer again asked Amy what had happened. Amy altered her story and told the officer she had been assaulted by Herschel. The officer then had Amy fill out and sign an affidavit. Amy handwrote the following:

> Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter.

547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 4). At a bench trial, Amy was subpoenaed but did not appear. Over the objection of defense counsel, the prosecutor admitted into evidence Amy's affidavit and admitted the police officer's testimony relating his conversation with Amy.[6] Herschel Hammon was convicted of domestic battery and of violating his probation.

The U.S. Supreme Court began its analysis of these two cases in *Davis* by considering whether the Confrontation Clause applies only to prohibit the use of formal, courtroom-style "testimonial hearsay." The Court acknowledged that the "perimeter" of the Confrontation Clause includes sworn statements before government officers:

> The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to "witnesses" against the accused—in other words, those who "bear testimony." 1 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "a solemn declaration or affirmation made for the purpose of establishing or proving some

fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 8–9)(*quoting Crawford*, 541 U.S. at 51, 124 S.Ct. 1354). However, the Confrontation Clause historically applied to statements beyond prior courtroom testimony and formal depositions and included informal statements to government officials:

> [T]he English cases that were the progenitors of the Confrontation Clause did not limit the exclusionary rule to prior court testimony and formal depositions. In any event, we do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition. Indeed, if there is one point for which no case—English or early American, state or federal—can be cited, that is it.

*Davis*, 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 11) (citation omitted).

In *Davis*, the Court sought to establish principles regarding the use of witness statements made to police during "interrogations." The Court stated that, when it said in *Crawford* that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay barred from use at trial, what the Court really meant to say was that the Confrontation Clause only bars the use of any statement made during "interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Davis*, 547 U.S. at ——, 126 S.ct. 2266 (Slip Op. at 11) (*citing Crawford*, 541 U.S. at 53,

---

**6.** The police officer testified that Amy
informed me that she and Hershel had been in an argument. That he became irrate [sic] over the fact of their daughter going to a boyfriend's house. The argument became ... physical after being verbal and she informed me that Mr. Hammon, during the verbal part of the argument was breaking things in the living room and I believe she stated he broke the phone, broke the lamp, broke the front of the

heater. When it became physical he threw her down into the glass of the heater.

> She informed me Mr. Hammon had pushed her onto the ground, had shoved her head into the broken glass of the heater and that he had punched her in the chest twice I believe.

*Davis*, 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 5).

124 S.Ct. 1354). In other words, witness statements made to law enforcement officers that are comparable to those that would be given in a courtroom—that is, statements about "what happened"—are testimonial statements, the use of which is proscribed by the Confrontation Clause.

The Court therefore set forth the following narrow rule, which the Court felt was necessary to determine the cases before it:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 7). The Court later emphasized that the phrase "ongoing emergency" means just that, and once a government officer has gained the information "needed to address the exigency of the moment" and "the emergency appears to have ended," then any further questioning by the government officer is more likely to elicit testimonial statements from the witness. 547 U.S. at ——————, 126 S.Ct. 2266 (Slip Op. at 13–14).

▬▬▬▬ The guidelines adopted by the Court in *Davis* are flexible and inherently fact-based, and the existence or lack of government interrogation does not necessarily determine whether a statement is testimonial. Similarly, a police officer's declaration that a statement was taken during an "ongoing emergency" does not make it so. *See* 547 U.S. at —————— n. 6, 126 S.Ct. 2266 (Slip Op. at 17–18 n. 6) ("While prosecutors may hope that inculpatory 'nontestimonial' evidence is gathered, this is essentially beyond police control. Their saying that an emergency exists cannot make it be so."). Instead, the focus of a court attempting to assess whether a witness's out-of-court statement is "testimonial" should be determined by evaluating the witness's statement, not

any interrogator's questions. The Court further stated in *Davis:*

Our holding refers to interrogations because . . . the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation. (Part of the evidence against Sir Walter Raleigh was a letter from Lord Cobham that was plainly *not* the result of sustained questioning. *Raleigh's Case,* 2 How. St. Tr. 1, 27 (1603).) And of course even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.

547 U.S. at —— – —— n. 1, 126 S.Ct. 2266 (Slip. Op. at 7–8 n. 1).

▬▬▬▬ We believe that the Court's holdings in *Crawford* and in *Davis* regarding the meaning of "testimonial statements" may therefore be distilled down into the following three points. First, a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. Second, a witness's statement taken by a law enforcement officer in the course of an interrogation is testimonial when the circumstances objectively indicate that there is no ongoing emergency, and that the primary purpose of the witness's statement is to establish or prove past events potentially relevant to later criminal prosecution. A witness's statement taken by a law enforcement officer in the course of an interrogation is non-testimonial when made under circumstances objectively indicating that the primary purpose of the statement is to enable police assistance to meet an ongoing emergency. And third, a court assessing whether a witness's out-of-court statement is "testimonial" should focus more upon the witness's

statement, and less upon any interrogator's questions.

The Court in *Davis* proceeded to apply these guidelines to the facts of Davis's and Hammon's cases. As to Davis, the Court concluded that circumstances objectively indicated that the primary purpose of the victim's statement in the 911 call was to appeal for police assistance to meet an ongoing emergency. The victim was not "acting as a *witness;* she was not *testifying* .... No 'witness' goes into court to proclaim an emergency and seek help." 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 13). The Court therefore found that the victim's "early statements identifying Davis as her assailant ... were not testimonial," and that the admission of the 911 call into evidence against Davis did not violate the Confrontation Clause.[7] 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 14). Davis's conviction was affirmed.

In Hammon's case, however, the Court found a "much easier task" than in Davis's case, 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 14), and concluded that the victim's affidavit and statements to a police officer clearly should not have been admitted. The Court found that the statements taken by the police officer took place some time after the events described were over, and the statements were "neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation." 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 17).

It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct ... There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything. When the officers first arrived, [the victim] Amy told them that things were fine, and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis* ) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the investigation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.

547 U.S. at —— – ——, 126 S.Ct. 2266 (Slip Op. at 14–15) (citations omitted).

■■■ The Court conceded that, particularly in domestic disputes, "[o]fficers called to investigate ... need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Davis,* 547 U.S. at ——, 126 S.ct. 2266 (Slip Op. at 17) (*quoting Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.,* 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)). In such exigent circumstances, a law enforcement officer's initial inquiries will often produce non-testimonial statements. But once it becomes objectively apparent that the emergency has passed, the investigation of a past crime—while necessary to prevent future harms and lead to necessary arrests—is likely to elicit testimonial statements from witnesses that will be subject to the constraints of the Confrontation Clause. As the Court said:

Police investigations themselves are, of course, in no way impugned by our charac-

---

7. The Court did suggest, however, that once it appeared that the emergency ended (when the victim stated that Davis had driven away from the premises), and the 911 operator told the victim to be quiet and began to ask questions comparable to a structured form of police questioning, the 911 operator began to elicit testimonial statements from the victim that might be barred from use by the Confrontation Clause.

This presents no great problem.... [T]rial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through *in limine* procedure, they should re-

dact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.

547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 14). The Court went on to point out that Davis's jury did not hear the complete 911 call, and that even if some latter portions of the call were testimonial, a lower court had determined their admission was harmless beyond a reasonable doubt. *Id.* Furthermore, the Court noted that Davis did not challenge the lower court's finding that the admission of the latter portions of the 911 call was harmless.

terization of their fruits as testimonial. Investigations of past crimes prevent future harms and lead to necessary arrests. While prosecutors may hope that inculpatory "nontestimonial" evidence is gathered, this is essentially beyond police control. Their saying that an emergency exists cannot make it be so. The Confrontation Clause in no way governs police conduct, because it is the trial *use* of, not the·investigatory *collection* of, *ex parte* testimonial statements which offends that provision. But neither can police conduct govern the Confrontation Clause; testimonial statements are what they are.

547 U.S. at ——–——— n. 6, 126 S.Ct. 2266 (Slip Op. at 17–18 n. 6).

The Court in *Davis* concluded that the Confrontation Clause clearly operated to exclude the victim's statements made in an affidavit and made to a law enforcement officer. Accordingly, the Court reversed the lower court judgment affirming Herschel Hammon's conviction, and remanded the case for further proceedings.

We turn now to the case before us.

■ Defendant Mechling asserts that the circuit court erred in permitting the State, contrary to the Confrontation Clause, to admit Ms. Thorn's statements made to the two sheriff's deputies when she did not appear for trial.[8] Based upon the U.S. Supreme Court's holding in *Davis*, we agree. It is clear from the circumstances that the deputies' interrogation of Ms. Thorn was part of an investigation into possibly criminal past conduct. There was no emergency in progress when the deputies arrived, and the de-

fendant had clearly departed the scene when the interrogation occurred. When the deputies questioned Ms. Thorn, they were seeking to determine "what happened" rather than "what is happening." Objectively viewed, the purpose of the deputies' interrogation was to investigate a possible crime—which is, of course, precisely what the deputies *should* have done. But the statements taken by the deputies could not become a substitute for Ms. Thorn's live testimony, because those statements "do precisely *what a witness does* on direct examination; they are inherently testimonial." *Davis*, 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 16).

■ Accordingly, we conclude it was error under the Confrontation Clause for the circuit court to permit the sheriff's deputies to testify as to their conversations with the victim. The record firmly establishes that this constitutionally infirm evidence influenced the trial court's decision,[9] and the beneficiary of this constitutional error—the State—has not attempted to establish beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We must therefore set aside the defendant's conviction, and remand the case for further proceedings.

The defendant also challenges on appeal the State's use of Mr. Alvarez's testimony regarding his conversation with Ms. Thorn. The defendant asserts that Ms. Thorn's statements to Mr. Alvarez were "testimonial hearsay" subject to the Confrontation Clause because an objective witness could have reasonably believed that the statements would be used at a later trial.[10] The record, howev-

---

8. The defendant contends that the State never made a proper record establishing that Ms. Thorn was unavailable. We presume, for purposes of our opinion, that Ms. Thorn was indeed properly served with a subpoena and was unavailable at the time of trial.

9. The circuit court stated that he found the defendant guilty beyond a reasonable doubt "upon the basis of the testimony" in the case, and the only testimony presented was that of Mr. Alvarez and Deputies Fields and Merrifield.

10. In footnotes 1 and 2 of *Davis*, the U.S. Supreme Court indicated that its opinion was focused upon "interrogations" by law enforcement officers, and thus it was "unnecessary to consid-

er whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" 547 U.S. at ——–—— n. 1 and n. 2, 126 S.Ct. 2266 (Slip Op at 7–8 n. 1 and n. 2).

However, in *Davis* the Court cited as authority decisions suggesting that statements made to non-law-enforcement individuals may be testimonial and also be subject to Confrontation Clause limitations. See 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 13) (*citing King v. Brasier*, 1 Leach 199, 168 Eng. Rep. 202 (1779) (wherein a "young rape victim, 'immediately on her coming home, told all the circumstances of the injury' to her mother.... The case would be helpful to *Davis* if the relevant statement had been the girl's

er, does not reveal the full extent of Mr. Alvarez's interaction with Ms. Thorn, and we cannot discern whether the admission of Ms. Thorn's statements through Mr. Alvarez was constitutionally permissible. The U.S. Supreme Court, in *Crawford* and *Davis,* seems to suggest that Ms. Thorn's statements would be non-testimonial to the extent that Mr. Alvarez was intervening to address an emergency and heard Ms. Thorn relate "what is happening." But those statements would be testimonial if the statements related "what happened," and the circumstances reflect a significant lapse of time before the statements were made to Mr. Alvarez. We leave it for the parties on remand to develop a thorough record of the circumstances surrounding Mr. Alvarez's admirable intervention, and for the circuit court to resolve whether the victim's statements to Mr. Alvarez were testimonial or non-testimonial.

We reach our decision in this case with some hesitation. This Court is painfully aware that domestic violence cases inherently present a combination of circumstances that obstruct, yet simultaneously intensify the need for, successful criminal prosecutions: low victim cooperation and high same-victim recidivism. *See* Tom Lininger, "Prosecuting Batterers after *Crawford,*" 91 Va.L.Rev. 747, 768–71 (2005). Frequently, the victims of domestic violence are deeply conflicted about their plight and refuse to seek police intervention, let alone testify at trial. Society commonly expects a victim of domestic violence to call the police. However, empirical data show that most domestic-violence victims do not call the police, and even when the police are called, the outcome is not always positive. May Ann Dutton, "Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome," 21 Hofstra L.Rev. 1191, 1229 (1993). According to one recent estimate, eighty to ninety percent of domestic violence victims who appeal to the criminal justice system for help recant or otherwise fail to assist the prosecution at some point in the proceedings. Lininger, 91 Va.L.Rev. at 768 n. 103; Douglas E. Beloof & Joel Shapiro, "Let the Truth Be Told: Proposed Hearsay Exceptions to Admit Domestic Violence Victims' Out of Court Statements as Substantive Evidence," 11 Colum. J. Gender & L., 1, 3 (2002).

Yet, without a successful arrest and prosecution, these victims are likely to be battered again. *See* American Medical Association, *Diagnostic and Treatment Guidelines on Domestic Violence* 6 (1992) (stating that 47% of husbands who batter their wives do so three or more times per year).

Some victims do not cooperate with prosecutors because they fear retaliation by the defendant. That fear may be a reasonable projection of past conduct. In other instances, there may be express threats of retaliation or actual retaliatory violence—against the victim or those close to the victim [11]—by the batterer. Indeed, some studies indicate that such threats and retaliation may occur in the majority of domestic violence prosecutions. *See, e.g.,* Lininger, 91 Va.L.Rev. at 769; Laura Dugan, *et al.,* "Exposure Reduction or Retaliation? The Effects of Domestic Violence Resources on Intimate–Partner Homicide," 37 Law & Soc'y Rev. 169, 179 (2003); Deborah Epstein *et al.,* "Transforming Aggressive Prosecution Policies: Prioritizing Victims' Long–Term Safety in the Prosecution of Domestic Violence Cases," 11 Am.U.J. Gender Soc. Pol'y & L. 465, 476 and n. 38 (2003) (describing a study in which women identified fear of their batterer as the number one reason why they were unwilling to cooperate with government).

Battered women are at an extremely heightened risk of violence—and even

---

screams for aid as she was being chased by her assailant. By the time the victim got home, her story was an account of past events."). Furthermore, the Court said that readers should not infer from the opinion that "statements made in the absence of any interrogation are necessarily nontestimonial." 547 U.S. at —— n. 1, 126 S.Ct. 2266 (Slip Op. at 7 n. 1).

Until the U.S. Supreme Court holds otherwise, we interpret the Court's remarks to imply that statements made to someone other than law enforcement personnel may also be properly characterized as testimonial.

11. We understand that batterers typically threaten not only the victim, but also the victim's children. Batterers threaten to either harm the victim's children, or to take the children from the victim by force or by judicial proceeding.

death—at the moment they seek to separate from their abusers. Cooperation in a criminal prosecution is often meant and understood, by both the abuser and victim, as a means of formally separating from an abuser—and thus, presents increased danger to the victim. *See, e.g.,* Dugan, 37 Law & Soc'y Rev. at 174. As a result, many individuals who have experienced domestic violence quite reasonably conclude that criminal prosecution of their abusers will leave them less, rather than more, safe. Individuals who have experienced domestic violence understand this dynamic; individuals who have not, and who rely on varied notions of law-abiding societal norms, do not understand and compound the victim's already difficult situation by blaming the victim for tolerating the batterer's misconduct. While attitudes are changing, battered women too often are viewed by the criminal justice system as somehow responsible for the crimes against them, further leading domestic violence victims to reject participation in criminal trials. Barbara Hart, "Battered Women and the Criminal Justice System," 36 Am. Behavioral Scientist 624, 626 (1993).[12]

The U.S. Supreme Court was not unmindful of this problem in domestic violence prosecutions when it issued *Crawford* and *Davis,* and neither is this Court. Still, the protections provided by the *Constitution* and the Confrontation Clause cannot be sacrificed by the State upon the altar of expediency to achieve a conviction in a domestic violence case.[13] But those protections may be sacrificed by the accused through a time-tested equitable doctrine: forfeiture.

■ Under the doctrine of forfeiture, an accused who obtains the absence of a witness

by wrongdoing forfeits the constitutional right to confrontation. In both *Crawford,* 541 U.S. at 62, 124 S.Ct. 1354 (*citing Reynolds v. United States,* 98 U.S. 145, 158–59, 25 L.Ed. 244 (1870)) and in *Davis,* 547 U.S. at —— —— —— (Slip Op. at 18–19), the U.S. Supreme Court identified the doctrine of forfeiture as a means by which an accused might lose the protection afforded by the Confrontation Clause.

The Court recognized that domestic violence crimes are "notoriously susceptible to intimidation of the victim to ensure that she does not testify at trial." *Davis,* 547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 18).

> When this occurs, the Confrontation Clause gives the criminal a windfall. We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free. . . . But when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford:* that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds."

547 U.S. at ——, 126 S.Ct. 2266 (Slip Op. at 18) (citations omitted). *See also, United States v. Dhinsa,* 243 F.3d 635, 651 (2nd Cir.2001) ("threats, actual violence, or murder" forfeit confrontation right); *West Virginia Rules of Evidence,* Rule 804(a)(5) [1994]

12. Other reasons victims of domestic violence do not testify include economic dependence on their batterer; concern that an immigrant batterer will be deported upon conviction; fear of an adverse reaction from family or community who might regard a victim's participation in the prosecution as a betrayal; apprehension that involvement in the criminal justice system will lead to the loss of child custody to a state child protective services agency; or continuing emotional connections to their batterers. Epstein, 11 Am. U.J. Gender Soc. Pol'y & L. at 477–82; Hart, 36 Am. Behavioral Scientist at 627–28.

13. Prosecutors claim that a domestic violence conviction can never be obtained without the use

of the victim's statement; yet, prosecutors routinely obtain convictions in murder cases without any statement from the victim.

It is important to recognize that, as with all crimes, *some* alleged victims will refuse to testify because their initial accusations were untrue or exaggerated. *Some* alleged victims may falsely accuse their partners of abuse in an attempt to gain an upper hand in the relationship, or in a separate court proceeding. Thus, the function of confrontation as a tool to vindicate the innocent has as much of a role in domestic violence prosecutions as in other criminal prosecutions.

("A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying."); *Federal Rules of Evidence*, Rule 804(b)(6) [1997] (excluded from the hearsay rule is any "statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.").

An accused's coercion or intimidation of a victim of domestic violence so as to trigger forfeiture can take many forms. The most obvious situation is where the accused directly confronts the victim after being charged, and intentionally coerces the victim into changing his or her statement, or simply not testifying. Another likely situation where an accused may trigger forfeiture is when, after being charged, the accused engages in further abuse or intimidation of the victim which is not explicitly intended to alter, but has the effect of altering, the victim's testimony. But, "[b]attered women ... may perceive danger and imminence differently from men.... A subtle gesture or a new method of abuse, insignificant to another person, may create a reasonable fear in a battered woman." *People v. Romero*, 13 Cal.Rptr.2d 332, 336 n. 6 (1992) (citation omitted). Hence, the most difficult forfeiture situation for courts to assess will be those circumstances where the victim responds to a batterer's actions that precede the domestic violence charge— that is, where the accused's earlier conduct and threats (statements like "don't you ever call the police or else!") cause the victim to decline to testify, claim a lack of memory, or be absent from the trial.

In order for forfeiture to be proven in domestic violence actions, prosecutors, law enforcement officers and courts must secure evidence—possibly from third parties—prior to trial, indicating that these victims are too frightened to testify about the intimidating and coercive character of the accused's actions. If a victim is too scared to testify against the accused, for fear of retribution, the victim will probably also be too scared to testify in any pre-trial forfeiture proceeding.

The U.S. Supreme Court has suggested that the government must meet a preponderance-of-the-evidence standard to establish forfeiture, and suggested that if a hearing on forfeiture is required, hearsay evidence may be considered by the trial court. *Davis,* 547 U.S. at —————, 126 S.Ct. 2266 (Slip Op. at 18–19). The purpose of a court relying upon the forfeiture doctrine is to protect the integrity of their proceedings.

Absent a finding of forfeiture by wrongdoing in this case, the Confrontation Clause of the Sixth Amendment to the *United States Constitution* and of Section 14 of Article III of the *West Virginia Constitution* operates to exclude the sheriff's deputies' testimony— and possibly Mr. Alvarez's testimony—regarding Ms. Thorn's accusations against the defendant. On remand, the circuit court may determine whether such a claim of forfeiture is properly raised and, if so, whether it is meritorious.

### IV.

#### *Conclusion*

The circuit court's November 19, 2004 judgment order is reversed, and the case is remanded for further proceedings.

Reversed and Remanded.