# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**v.)  No. 22-870** (Roane County CC-44-2018-F-92)

**Richard Waters,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Richard Waters appeals the Circuit Court of Roane County's October 25, 2022, sentencing order following his convictions for sexual abuse by a custodian and third-degree sexual assault.[1] On appeal, the petitioner argues that he was denied the right to confront a witness against him at trial, the circuit court erroneously struck certain prospective jurors and failed to strike another during jury selection, and the court erred in denying his motion to continue trial. Upon our review, finding no substantial question of law and no prejudicial error, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21(c).

The petitioner was indicted in 2018 on one count of sexual abuse by a parent, guardian, custodian, or person in a position of trust to a child[2] and one count of third-degree sexual assault,[3] and his two-day trial on these charges occurred in June 2019. During jury selection, one prospective juror, C.D., stated that he knew two people who were victims of sex crimes. One was a former girlfriend, and the other was a child his family fostered while C.D. was in high school. C.D. denied that his prior acquaintance with victims of sex crimes would affect his impartiality in determining guilt, but he did assert that it could impact his impartiality "[o]nly in sentencing." The petitioner moved to strike C.D. for cause, arguing that his response regarding sentencing "shows he does have hard feelings in cases such as this." The circuit court denied the petitioner's motion.

A.W., another prospective juror, disclosed that her son and brother had been prosecuted by the State. A.W.'s son was prosecuted within the year preceding the petitioner's trial, and her

---

[1] The petitioner appears by counsel John J. Balenovich. The State appears by Attorney General Patrick Morrisey and Deputy Attorney General Andrea Nease Proper. We note that initials are used where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[2] *See* W. Va. Code § 61-8D-5.

[3] *See id.* § 61-8B-5.

1

brother's case involved a sex crime against a minor. A.W. said that she did not bear ill will toward the State, she believed her relatives were treated fairly, and she thought she could be fair. The State moved to strike A.W. for cause, arguing that A.W.'s brother was convicted of a sex crime within "the past couple years" and that her son was prosecuted within the past year for second-degree arson and grand larceny, which the State further argued was "pretty fresh under all the circumstances." The court granted the State's motion to strike.

The court also granted the State's motion to strike prospective juror M.A. for cause, who stated that his grandson's father had been accused of sexually offending children but "didn't have the money to fight it" so "didn't have a chance." M.A. said he knew that his grandson's father "didn't do it" and, to his knowledge, his grandson's father was not appointed an attorney. M.A. agreed that "the system worked against him a little bit." Still, M.A. agreed that he could give both sides "a fair shake." The prosecutor, however, explained to the court that he handled the case discussed by M.A. and was "bother[ed]" by M.A.'s claim that his grandson's father was not treated fairly because the prosecutor believed that the individual confessed. The prosecutor also stated with certainty that the individual had an attorney.

On day one of trial, the State's witnesses included, among others, the victim, K.F.;[4] and Laura Kuyper, a forensic DNA analyst employed at the Marshall University Forensic Science Center ("Science Center"). K.F. testified that, in July or August 2017, when she was fourteen years old, she "was raped" by the petitioner. She testified that the petitioner regularly made alcohol accessible to her and encouraged her to drink, and he supplied alcohol on the night of her assault. Due to her intoxication, she remembered only "a little bit," but she recalled the petitioner "being lower affectionate." Her next recollection was waking up the following morning in the petitioner's room. K.F. became pregnant and delivered a baby girl approximately nine months after the assault. K.F. testified that the petitioner was the father of that child.

Ms. Kuyper, who was qualified as an expert in the field of DNA testing, testified that swabs taken from the petitioner, K.F., and K.F.'s baby were submitted to the Science Center for paternity testing. Ms. Kuyper testified to the process involved in paternity testing, and in this instance, much of the preparatory work in the process was performed by Heather Harrah, a DNA analyst at the Science Center. Ms. Kuyper testified that, for each sample submitted, Ms. Harrah cut portions of the submitted swabs, extracted DNA from the cuttings, quantified the amount of DNA in the cutting, amplified (or made copies of) the DNA, and then ran a portion of the amplified product on the Science Center's "genetic analyzer." This process produced a DNA profile for each submitted sample, and Ms. Kuyper, who is "trained to read the testing and reporting" necessary to generate a paternity report, then compared the developed DNA profiles side-by-side. Ms. Kuyper testified that "[e]very area . . . for the child sample that didn't match the mother matched at the alleged father, [the petitioner]." Ms. Kuyper opined that "[i]t is 28 trillion times more likely that [the petitioner] is the biological father" than "an untested random man from the Caucasian population," and the probability that the petitioner is the father of K.F.'s baby is 99.9999%. Ms. Kuyper drafted a report containing "the results of the testing that [she] came up with," and the State made clear, "This comparison at the bottom of the report, the 99.9999, that's your finding;

---

[4] K.F. was the petitioner's wife's cousin, who came to live in the petitioner's home.

correct?" Ms. Kuyper answered, "Yes." Her report was entered into evidence, and the petitioner lodged no objection to Ms. Kuyper's testimony.

The State rested after the first day of trial concluded, and the jury was excused for the evening. The petitioner's counsel informed the court that he "would like to try to get [Trooper Bragg, of the West Virginia State Police] here for tomorrow." Even though Trooper Bragg was disclosed by the State as a potential witness (but ultimately not called by the State) with a notation that the "client says Bragg brought her home," the petitioner's counsel said that he had been under the mistaken impression that a different officer returned K.F. to the petitioner's home at some point in the past.[5] The State pointed out that, in addition to its disclosure of Trooper Bragg, the petitioner, in his recorded statement to the police, said that Trooper Bragg returned K.F. to the petitioner's home. The petitioner's counsel retorted that the petitioner's statement was "difficult to understand" and did not "ring a bell with me to know who we are talking about," and counsel said that he "had no idea" what the State's disclosure notation meant. The court noted that it was "a little bit late in the ballgame" to raise this issue; that Trooper Bragg "no longer works for the state police, not even in the state as far as I know"; and that Trooper Bragg had been disclosed by the State. Even so, the court offered, "If you can locate him and want him brought here tomorrow, you're certainly welcome to do it, but I am not going to continue the trial or do anything like that because he's not available, because that information was available to you." The petitioner took no action to secure Trooper Bragg's presence at trial.

Trial resumed the next day, and the petitioner testified, stating that he had knowledge of the sexual "encounter" described by K.F. and he explained the circumstances surrounding it. The petitioner related that K.F. and others attended his forty-fourth birthday party in early August 2017 and K.F. became intoxicated, but he denied providing her alcohol. He further stated that fourteen-year-old K.F. "obviously, was intoxicated," and that a "teenager going to behave promiscuously, pretty much with everybody." He agreed that she was "kind of flirty" at the party. The petitioner also testified that a married couple who had an open relationship attended his party and that the couple intended for the petitioner to sleep with the wife that night, as the petitioner had done in the past.

The petitioner said that he became extremely intoxicated at his party and had to be carried to bed. His next recollection was "[w]aking up at some point during the night in the middle of intercourse." The petitioner claimed that the room was "extremely dark," and he "assumed it was [his] buddy's wife" on top of him. He testified that he learned that it was K.F. only when she spoke, saying "something to the tune of happy birthday." The petitioner denied raping K.F., asserting, "In fact, I suspect if it was actually placed down, it would probably [be] considered the opposite."

At the conclusion of the petitioner's trial, the jury found him guilty of both counts charged in the indictment, and the court sentenced him to not less than ten nor more than twenty years of incarceration for his sexual abuse by a custodian conviction and to a consecutive term of not less than one year nor more than five years for his third-degree sexual assault conviction. The petitioner

---

[5] During this exchange, the petitioner did not specify what knowledge he believed Trooper Bragg possessed or explain its relevance to the case.

now appeals from the court's October 25, 2022, order, which resentenced him for purposes of an appeal, and raises three assignments of error.

In the petitioner's first assignment of error, he argues that he was denied his right to confront a witness against him, namely, Ms. Harrah. The petitioner states that the "primary purpose of Ms. Kuyper's evidence was to prove the petitioner was the biological father" of K.F.'s child, and he identifies "[t]he paternity of the child" as "a fact the State was attempting to prove at trial." He contends that Ms. Kuyper's testimony on this point "was based solely on a summary of laboratory tests performed by" Ms. Harrah. Because, according to the petitioner, Ms. Kuyper "did not physically conduct nor observe the tests she presented as evidence" and her testimony was "nothing more than a recitation" of Ms. Harrah's work, he characterizes Ms. Kuyper as a "surrogate" witness and claims that Ms. Harrah was the "necessary witness" to present the testimonial paternity test results.

At trial, the petitioner failed to object to Ms. Kuyper's testimony concerning the DNA testing that established the petitioner as the father of K.F.'s baby.[6] As a result, our review is for plain error. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). "To be 'plain,' the error must be 'clear' or 'obvious,'" *id.* at 7, 459 S.E.2d at 118, Syllabus Point 8, in part; and, "[t]o affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice." *Id.* at 7, 459 S.E.2d at 118, Syl. Pt. 9, in part.

Regarding the petitioner's right of confrontation, we have held that

> [p]ursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

Syl. Pt. 6, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006). "[O]nly hearsay statements fall within the prohibition of the *Crawford/Mechling* rule," *State v. Lambert*, 232 W. Va. 104, 110, 750 S.E.2d 657, 663 (2013), and, generally, a "testimonial statement" is one "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Mechling*, 219 W. Va. at 368, 633 S.E.2d at 313, Syl. Pt. 8, in part. The Supreme Court of the United States has described testimonial statements as those "made for the purpose of establishing or proving some fact." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quoting *Crawford*, 541 U.S. at 51).

---

[6] The petitioner also failed to alert this Court to the fact that plain error is asserted, as was required under Rule 10(c)(3) of the West Virginia Rules of Appellate Procedure. Instead, the petitioner undertook a plain error analysis in his reply brief, after the State, in its response brief, made note of the petitioner's failure to object and argued that no plain error resulted.

The petitioner characterizes the expert opinion regarding K.F.'s child's paternity as "testimonial hearsay." But because Ms. Kuyper, the witness who formulated that opinion based on her own training and expertise, testified at the petitioner's trial and was subject to cross-examination, it is not, and the petitioner was not denied the right to confront the witness who offered the expert opinion evidence he challenges.[7] Nevertheless, even if the State's failure to call Ms. Harrah to testify to her role in the paternity-determination process amounted to error that was plain, reversal would not be warranted. The petitioner admitted to engaging in sexual intercourse with fourteen-year-old K.F., and "[p]lain error warrants reversal 'solely in those circumstances in which a miscarriage of justice would otherwise result.'" *Miller*, 193 W. Va. at 18, 459 S.E.2d at 129 (quoting *United States v. Frady*, 456 U.S. 152 (1982)). In view of the petitioner's admission at trial, it is clear that the alleged errors did not affect the jury's verdict, and this is not a situation in which a miscarriage of justice would result without reversal. Therefore, we find no plain error in Ms. Kuyper's testimony or in Ms. Harrah's failure to testify.

The petitioner's second assignment of error focuses on jury selection. He argues that the court erred in denying his motion to strike potential juror C.D. for cause because C.D. demonstrated a "prejudicial bias" against those accused of sexual offenses by asserting that he could not remain impartial during sentencing and because he knew two victims of sex crimes. The petitioner complains that he was forced to use a peremptory strike to remove C.D. The petitioner also argues that the court erred in granting the State's motions to strike A.W. and M.A. The petitioner highlights that A.W. said she thought her son was treated fairly during his recent prosecution, and M.A. said he could give the parties a "fair shake."

> In reviewing the qualifications of a jury to serve in a criminal case, we follow a three-step process. Our review is plenary as to legal questions such as the statutory qualifications for jurors; clearly erroneous as to whether the facts support the grounds relied upon for disqualification; and an abuse of discretion as to the reasonableness of the procedure employed and the ruling on disqualification by the trial court.

*State v. Miller*, 197 W. Va. 588, 600-01, 476 S.E.2d 535, 547-48 (1996). To be sure, trial courts enjoy "broad discretion in determining whether to strike jurors for cause, and we will reverse only where actual prejudice is demonstrated." *Id.* at 605, 476 S.E.2d at 552 (citation omitted). Furthermore, even when a trial court fails to remove a biased juror from the panel, a defendant's right to trial by an impartial jury is not violated if the defendant exercises a peremptory strike to remove the juror. Syl. Pt. 3, in part, *State v. Sutherland*, 231 W. Va. 410, 745 S.E.2d 448 (2013). In that instance, too, "a criminal defendant must show prejudice" before we will award a new trial. *Id.* Finally, to demonstrate prejudice,

---

[7] To the extent that the petitioner is challenging Ms. Kuyper's reliance on preparatory work performed by Ms. Harrah in reaching her paternity opinion, we note that Rule 703 of the West Virginia Rules of Evidence permitted Ms. Kuyper to base her opinion "on facts or data in the case that the expert has been made aware of." The rule further provides that "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.*

a challenge must show that the appellant was forced to accept a juror who should have been excused for cause. That is, appellate courts will not find reversible error based on the trial court's refusal to remove that juror for cause unless the resulting jury was not fair and impartial.

*State v. Benny W.*, 242 W. Va. 618, 628, 837 S.E.2d 679, 689 (2019) (quoting *State v. Rollins*, 233 W. Va. 715, 729, 760 S.E.2d 529, 543 (2014)).

The petitioner states in conclusory fashion that he was prejudiced by the court's actions during jury selection, but other than claiming that he was forced to use a peremptory strike, which is insufficient to establish prejudice, he does not describe how he was prejudiced. *See Sutherland*, 231 W. Va. at 417, 745 S.E.2d at 455 ("[P]rejudice cannot be established merely because a defendant exercised a peremptory strike to remove the juror from the jury panel."). The petitioner's failure to identify prejudice or otherwise demonstrate that the resulting jury was not fair and impartial is fatal to his claim. *See Benny W.*, 242 W. Va. at 628-29, 837 S.E.2d at 689-90 ("Petitioner has simply made an unsupported statement that he would have struck other jurors who sat on the jury. Petitioner failed to allege any facts to show that a juror who sat on the jury was biased, and thereby prejudiced his right to a fair trial. Consequently, we find no merit to this assignment of error.").

Lastly, the petitioner claims that the court erred in denying his motion to continue trial to subpoena Trooper Bragg. The petitioner characterizes Trooper Bragg's involvement in this matter as "newly discovered evidence," and he asserts that Trooper Bragg could testify as to whether the petitioner was "extremely intoxicated" while giving his statement to another law enforcement officer. The petitioner argues that he was deprived of the "ability to provide a vigorous defense . . . since he was not allowed to subpoena Trooper Bragg."

To begin, from this Court's review of the trial transcript, it does not appear that the petitioner moved for a continuance, and the petitioner includes no citation to the appendix record "pinpoint[ing] when and how" he did. *See* W. Va. R. App. P. 10(c)(7). Although this failure permits the Court to "disregard" the claimed error, *id.*, we nevertheless find that the court did not abuse its discretion in choosing not to continue the trial to provide additional time for the petitioner to procure Trooper Bragg's presence at trial. *See* Syl. Pt. 2, *State v. Bush*, 163 W. Va. 168, 255 S.E.2d 539 (1979) ("A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of discretion."). Trooper Bragg was disclosed by the State as a potential witness, and his relevance to this case was noted in the disclosure. In other words, his involvement was not "newly discovered." Moreover, the petitioner has failed to explain how any recollection Trooper Bragg may have of the petitioner's supposed intoxication when giving his statement to another officer deprived him of a defense. Finally, the court did not deny the petitioner the opportunity to subpoena Trooper Bragg; the court explicitly told the petitioner he was welcome to try to get the officer to court the following day. Accordingly, there is no merit to this assignment of error.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 10, 2024

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn