**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:　　Justices:
Marilyn Kelly　　Michael F. Cavanagh
　　　　　　　　Elizabeth A. Weaver
　　　　　　　　Maura D. Corrigan
　　　　　　　　Robert P. Young, Jr.
　　　　　　　　Stephen J. Markman
　　　　　　　　Diane M. Hathaway

JUNE 10, 2009

PEOPLE OF THE STATE OF MICHIGAN,

　　　　　Plaintiff-Appellee,

v

No. 133725

RICHARD PERRY BRYANT,

　　　　　Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider whether the victim's statements to the police in this case constituted inadmissible testimonial hearsay within the meaning of the United States Supreme Court's decisions in *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004), and *Davis v Washington*, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006). The Court of Appeals held that the statements were non-testimonial under the test set forth in *Davis*, 547 US at 822, because they were made "in the course of a police interrogation under circumstances objectively indicating that its primary purpose was to enable police assistance to meet an ongoing emergency." *People v Bryant (On Remand)*, unpublished opinion per curiam of the Court of Appeals, issued

March 6, 2007 (Docket No. 247039), at 3. Because we conclude on the basis of *Crawford* and *Davis* that the "primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution," *Davis*, 547 US at 822, we respectfully disagree and hold that the statements constituted inadmissible testimonial hearsay. Moreover, we conclude that the admission of these statements constituted plain error requiring reversal. Therefore, we reverse the Court of Appeals and remand for a new trial.

## I. FACTS AND HISTORY

The victim lived with his brother within a few houses of defendant, from whom he had been purchasing cocaine for three years. The victim's brother testified that defendant sold drugs to the victim at defendant's back door. On April 28, 2001, the victim told his brother that he planned to redeem an expensive coat that he had pawned with defendant in exchange for some cocaine. On April 29, 2001, between 3:00 and 3:30 a.m., the brother heard gunfire, and at about 3:25 a.m., five police officers responded to a radio dispatch indicating that a man had been shot. They found the victim lying on the ground next to his car at a gas station about six blocks from defendant's house. The victim had a gunshot wound in his abdomen and appeared to be in considerable pain. In response to the officers' questioning, the victim indicated that he had been shot at approximately 3:00 a.m. while standing outside defendant's back door. The victim stated that before being shot he had a short conversation through a closed door with defendant. He identified defendant as the shooter because, although he did not see

defendant shoot him, he knew that it was defendant who had shot him because he recognized defendant's voice. While the victim described defendant as being 40 years old, 5' 7" tall, and about 140 pounds, according to defendant's driver's license, defendant was actually 30 years old, 5' 10" tall, and 180 pounds. Although the brother testified that the victim knew defendant's last name, the victim himself told the police that he did not know defendant's last name.[1] The victim told the police that, after he was shot, he drove himself to the gas station. The victim died within a few hours after he was transported to the hospital. When the police left the gas station, they immediately proceeded to defendant's house. The police found what appeared to be blood and a bullet on defendant's back porch and what the police believed to be a bullet hole in the back door. The victim's wallet and identification were also discovered outside defendant's house. However, the police did not discover any drugs, guns, bullets, or the victim's coat when they searched defendant's house at approximately 5:30 a.m. on the morning of the shooting. Defendant's girlfriend testified that defendant was not home at the time of the shooting and that she had not heard any gunfire that morning. The medical examiner testified that the bullet that killed the victim had passed through an intermediary target, such as a door. Toxicology tests showed that the victim

---

[1] Defendant, whose name is Richard, goes by the name "Rick," and the victim told the police that "Rick" shot him.

3

had consumed cocaine within four hours of his death. Defendant was arrested one year later in California and was extradited to Michigan.

Defendant's first trial resulted in a hung jury. Following a second jury trial, and after two days of deliberations, defendant was convicted of second-degree murder, being a felon in possession of a firearm, and possession of a firearm during the commission of a felony.[2] The Court of Appeals affirmed. *People v Bryant*, unpublished opinion per curiam of the Court of Appeals, issued August 24, 2004 (Docket No. 247039).

Defendant appealed, arguing that the trial court erred by admitting the victim's statements to the police identifying him as the shooter.[3] This Court held defendant's application for leave to appeal in abeyance pending our consideration of *People v Mileski*, 472 Mich 927 (2005), and *People v Walker*, 472 Mich 928 (2005). After we subsequently vacated our orders granting leave to appeal in *Mileski* and *Walker* and remanded those cases to the Court of Appeals for reconsideration in light of the United States Supreme Court's decision in *Davis*, we similarly remanded this case. On remand, the Court of Appeals again affirmed, concluding that the victim's statements constituted admissible non-

---

[2] The jury acquitted defendant of first-degree murder.

[3] The trial court's decision predated the United States Supreme Court's decisions in *Crawford* and *Davis*. The trial court denied defendant's motion to suppress the victim's statements to the police, holding that these statements were admissible under the excited utterance exception to the hearsay rule, MRE 803(2).

testimonial hearsay. *Bryant (On Remand)*, *supra* at 3. When defendant again appealed, we granted leave. *People v Bryant*, 482 Mich 981 (2008).

## II. STANDARD OF REVIEW

Whether the admission of the victim's statements to the police violated defendant's Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo. *People v Drohan*, 475 Mich 140, 146; 715 NW2d 778 (2006).

## III. ANALYSIS

Defendant argues that the admission of the victim's statements to the police identifying defendant as the shooter violated his Sixth Amendment right of confrontation. The Confrontation Clause of the Sixth Amendment of the United States Constitution guarantees a criminal defendant the right "to be confronted with the witnesses against him . . . ." US Const, Am VI.[4] In *Crawford*, 541 US at 59, the United States Supreme Court held that "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Although the Court left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" it did say that "[w]hatever else the term covers, it applies at a minimum to prior testimony . . . and to police

---

[4] The Michigan Constitution also guarantees criminal defendants the right "to be confronted with the witnesses against him or her . . . ." Const 1963, art 1, § 20.

5

interrogations." *Id.* at 68. The Court defined "[t]estimony" as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 51, quoting *American Dictionary of the English Language* (1828). The Court explained that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* The Court recognized that "[v]arious formulations of this core class of 'testimonial' statements exist," such as "'pretrial statements that declarants would reasonably expect to be used prosecutorially'" and "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id.* at 51-52 (citations omitted). However, the Court indicated that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." *Id.* at 52. The Court stated that "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class." *Id.* at 53. The Court further stated that it was "us[ing] the term 'interrogation' in its colloquial, rather than any technical legal, sense." *Id.* at 53 n 4. Finally, *Crawford* concluded that the statement that the defendant's wife had given in that case in response to police questioning at the police station constituted an inadmissible testimonial hearsay statement. *Id.* at 53 n 4, 68.

In *Davis*, the Supreme Court further expounded on the meaning of the term "testimonial hearsay statements." The Court held that "[s]tatements are

6

nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 547 US at 822. On the other hand, "[t]hey are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* *Davis* further explained that "in the final analysis [it is] the declarant's statements, not the interrogation's questions, that the Confrontation Clause requires us to evaluate." *Id.* at 822 n 1.[5]

The statements in dispute in *Davis* were made to a 911 emergency operator. The victim told the operator, "[The defendant's] here jumpin' on me again"; "He's usin' his fists." *Id.* at 817. The Court held that these statements were non-testimonial. *Id.* at 829. The Court asserted that *Davis* was distinguishable from *Crawford* because in *Davis*: (1) the victim was "speaking about events *as they were actually happening*, rather than [as in *Crawford*] 'describ[ing] past events . . . hours after the events . . . had occurred"; (2) thus, in contrast to the victim in *Crawford*, the victim "was facing an ongoing emergency"; (3) "the nature of what was asked and answered . . . was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in

---

[5] Although the focus here is on the statements made by the declarant to the interrogators, the interrogators' questions would nevertheless seem to provide necessary context in understanding the "primary purpose" of these statements.

*Crawford*) what had happened in the past"; and (4) the victim's "frantic answers were provided over the phone, in an environment that was not tranquil, or even . . . safe," while, in *Crawford*, the victim was "responding calmly, at the station house, to a series of questions . . . ." *Id.* at 827 (emphasis in the original; citation omitted). The Court held that the "primary purpose" of the interrogation in *Davis* "was to enable police assistance to meet an ongoing emergency," and, thus, the elicited statements were non-testimonial. *Id.* at 828-829.

In *Hammon*, a companion case decided with *Davis*, the police responded to a reported domestic disturbance. When the police arrived, the victim was sitting alone on the porch and the defendant was inside. The victim told the police that the defendant had hit her and thrown her. The Court held that because "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime," the victim's statements to the police were testimonial. *Id.* at 830. The Court explained that *Hammon* was distinguishable from *Davis* because in *Hammon*: (1) "the interrogation was part of an investigation into possibly criminal past conduct"; (2) "[t]here was no emergency in progress"; and (3) "[w]hen the officer questioned [the victim], . . . he was not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.'" *Id.* at 829-830. As the Court further explained:

> The statements in *Davis* were taken when [the victim] was alone, not only unprotected by police (as [the victim in *Hammon*] was protected), but apparently in immediate danger from [the defendant]. [The victim in *Davis*] was seeking aid, not telling a story about the past. [The *Davis* victim's] present-tense statements

8

showed immediacy; [the *Hammon* victim's] narrative of past events was delivered at some remove in time from the danger she described. [*Id.* at 831-832.]

By contrast, the Court reasoned that *Hammon* was similar to *Crawford* because: (1) "[b]oth declarants were actively separated from the defendant"; "[b]oth statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed"; and (3) "both took place some time after the events described were over." *Id.* at 830. Accordingly, the statements in *Hammon*, like those in *Crawford*, were testimonial. *Id.*

In the instant case, there is no question that the victim is unavailable, and defendant did not have a prior opportunity to cross-examine the victim. Therefore, if the victim's statements to the police were testimonial in nature, they are inadmissible. *Crawford*, 541 US at 68.[6] Accordingly, the only issue here is whether the victim's statements were made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the

---

[6] The prosecutor argues that the victim's statements to the police are admissible because they fall within the excited utterance exception of MRE 803(2). However, this argument is clearly incompatible with the United States Supreme Court's decision in *Crawford.* As that Court indicated, "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protections to the vagaries of the rules of evidence . . . ." *Crawford*, 541 US at 61. Instead, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69. See, also, McCormick, Evidence (6th ed), § 252, p 163, citing *Crawford*, 541 US at 59 n 8 ("While . . . [the *Crawford* Court] suggested that dying declarations might be excepted for historical reasons, the Court took a different view of excited utterances (also known as spontaneous declarations).").

9

interrogation was to enable police assistance to meet an "ongoing emergency," as defined by the United States Supreme Court, or whether the primary purpose of this interrogation was to establish or prove past events potentially relevant to a later criminal prosecution. *Davis*, 547 US at 822.

On remand, the Court of Appeals held that the statements in this case were non-testimonial, and thus affirmed defendant's convictions.[7] We, however, agree with defendant that the statements were testimonial pursuant to *Crawford* and *Davis*. The police found the victim lying on the ground outside a gas station. The police asked him what had happened, who had shot him, and where the shooting had occurred. The victim told the police that defendant shot him about 30 minutes earlier at defendant's house, which was about six blocks away, and that he drove himself to the gas station. These statements related solely to events that had occurred in the past and at a different location. None of these statements referred to events occurring at the time the statements were made, none alleged any ongoing threat, and none asserted the possible presence of the alleged perpetrator.

---

[7] In its first opinion, the Court of Appeals stated, "The one question asked by the police—'what happened?'—does not constitute an interrogation and there is no evidence of interrogation." *Bryant*, *supra* at 2. In its second opinion, however, the Court of Appeals recognized that the police had, in fact, asked the victim multiple questions and that the victim's statements were "made in the course of a police interrogation." *Bryant (On Remand)*, *supra* at 3. Indeed, the police admittedly asked defendant a "series of questions." In its second opinion, the Court of Appeals stated, "The questioning was used to establish . . . whether the shooter . . . followed [the victim] to the gas station . . . ." *Id*. However, none of the officers testified that they ever asked the victim whether the shooter followed the victim to the gas station or any similar questions.

The circumstances, in our judgment, clearly indicate that the "primary purpose" of the questioning was to establish the facts of an event that had *already* occurred; the "primary purpose" was not to enable police assistance to meet an ongoing emergency.[8] The crime had been completed about 30 minutes earlier and six blocks from where the police questioned the victim. The police asked the victim what had happened in the past, not what was currently happening. That is, the "primary purpose" of the questions asked, and the answers given, was to enable the police to identify, locate, and apprehend the perpetrator.

*Davis* stated that "in the final analysis [it is] the declarant's statements, not the interrogation's questions, that the Confrontation Clause requires us to evaluate." *Id.* at 822 n 1. The declarant here (i.e., the victim) made these statements while he was surrounded by five police officers and knowing that emergency medical service (EMS) was on the way. Obviously, his primary purpose in making these statements to the police was not to enable the police to meet an ongoing emergency of the type identified by the United States Supreme Court, but was instead to tell the police who had committed the crime against him,

---

[8] The dissent contends that the "time lapse" between the shooting and the questioning does not necessarily mean that the emergency was not ongoing when the questioning occurred. *Post* at 3. However, the dissent overlooks that part of *Davis*, 547 US at 828-829, in which the Supreme Court concluded that once the defendant had stopped assaulting the victim and left the scene of the crime, the "ongoing emergency" was over. Applying that same reasoning to the instant case, the "ongoing emergency," at least in the *Davis* sense, was over once the victim was able to escape from defendant and drive six blocks to the gas station.

11

where the crime had been committed, and where the police could find the criminal. That is, the primary purpose of the victim's statements to the police was to "establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 US at 822.[9]

Further, the officers' actions do not suggest that the officers themselves considered the circumstances at the gas station to constitute an "ongoing emergency,"[10] at least not as the Supreme Court defines that term. None of the officers testified to taking any actions to secure the area, to search the station for the possible presence of any armed individuals, or to provide cover for other officers. None of the officers indicated that he drew his weapon at the gas station, took up a defensive position out of concern that the shooter might be nearby, or called for any backup assistance to ensure the safety of the officer himself or others in the area. And none of the police officers questioned people who were in or around the gas station (other than the victim and the gas station attendant) or

---

[9] The fact that *Davis* held that the pertinent question is the statement's "primary purpose," rather than its "sole purpose," suggests that statements may be considered testimonial even though the statements may to some extent "enable police assistance to meet an ongoing emergency." However, this matter need not be amplified upon in the present case.

[10] *Davis* explained that "police conduct [cannot] govern the Confrontation Clause; testimonial statements are what they are." *Davis*, 547 US at 832 n 6. "Their saying that an emergency exists cannot make it be so." *Id.* In the instant case, the police conduct (although not dispositive) does not even remotely suggest that the police believed that an ongoing emergency existed while they were interrogating the victim at the gas station.

12

searched in any way at the station for the shooter.[11]  Rather, they acted in a manner entirely consonant with officers who knew that the crime had already been committed, that it had been committed at a different location, and that there was no present or imminent criminal threat.  Indeed, once the EMS unit arrived for the victim, the police left the gas station and immediately proceeded to defendant's

---

[11] Contrary to the dissent's contention, *post* at 4 n 1, the police were specifically asked these types of questions.  For example, one officer was asked, "When your partner parked the car, what did you do?" to which he responded, "I got out of the vehicle and I went towards [the victim]."  This officer was then asked if he went "immediately" to the victim and the officer responded, "Yes, I did."  This officer was then asked, "You didn't go into the [gas] station and ask what had happened or anything like that," to which he responded, "Negative, no."  Then, the officer was asked, "What did [your partner] do upon parking the car?" to which he said, "He got out of the vehicle too [and walked] towards [the victim]."  The officer was then asked, "While you're talking to [the victim], where is [your partner]?" to which he responded, "He was right there with me."  The officer was also asked whether he was standing or kneeling, and he indicated that he was standing.  Another officer was asked, "Where did [the officers] go" when they got out of their vehicles, and he indicated that they "all went to [the victim]."  Yet another officer was asked, "Where were [the other officers] when you arrived?" and he responded, "They were by [the victim]."  This officer was then asked whether he "went straight to [the victim] or did . . . something else," to which he responded, "I went straight to [the victim]."  Then, this officer was asked, "You mean the entire time you were there you spent that entire time talking with [the victim], is that what you're saying," and he said, "The majority of the time there I did, yes."  Another officer was asked, "So you get there and there's already two [sic] officers over near [the victim] on the ground and so you go over there also, correct," to which he responded, "Correct."  This officer was then asked, "You didn't look around and say, gee, there might be a shooter around here, I better keep an eye open," to which he said, "I did not, no."  Finally, another officer was asked, "And when you got there at the gas station what did you, what's the first thing you did?" to which he responded, "I approached the subject, the victim . . . on the ground and asked him something like what happened."  This officer was then asked, "Did your partner go with you?" and he responded, "Yes.  Yes.  He followed right behind me."

house, where they *then* called for backup assistance because they feared that defendant might still be inside.[12]

The primary purpose of the police questioning of the victim at the gas station was to determine who shot the victim and where the shooter could be found so that they could arrest him. The police were at the gas station to investigate a past crime, not to prevent an ongoing one, and the victim was not "speaking about events *as they were actually happening*," as in *Davis*, but was "'describ[ing] past events,'" as in *Crawford* and *Hammon*. *Davis*, 547 US at 827 (emphasis in the original; citation omitted).[13] The primary purpose of the victim's statements was

---

[12] Some of the officers actually left the gas station to proceed to defendant's house even before EMS arrived. The dissent contends that the fact that the police called for backup assistance when they reached defendant's house indicates that there was an "ongoing emergency." *Post* at 4 n 1. Even if there was an "ongoing emergency" at defendant's house (which we do not concede since defendant was not even at his house when the police arrived), this "ongoing emergency" existed at defendant's *house*, not at the gas station at which the statements were made. Further, referring to the police investigation at defendant's house as an "ongoing emergency" for purposes of evaluating an alleged *Crawford* violation is inconsistent with *Davis*, 547 US at 828-829, as the Court concluded in that case that once the defendant had stopped beating the victim and left the premises, the "ongoing emergency" had ended, *despite the fact that a dangerous criminal remained on the run*. Under the dissent's approach, if there is an "ongoing emergency" *anywhere* (or even what the police *perceive* to be such an "ongoing emergency"), a victim's statements to the police are to be considered non-testimonial even if those statements are made away from the actual venue of this "ongoing emergency."

[13] In *Davis*, 547 US at 828, the Court discussed *King v Brasier*, 1 Leach 199, 168 Eng Rep 202 (1779), in which "a young rape victim, 'immediately on her coming home, told all the circumstances of the injury' to her mother." *Davis* stated that "if the relevant statement had been the girl's screams for aid as she was being chased by her assailant," the statement would have been non-testimonial.

14

not "to describe *current* circumstances requiring police assistance," as in *Davis*, but to "establish[] the facts of a *past* crime, in order to identify (or provide evidence to convict) the perpetrator," as in *Crawford* and *Hammon.* *Davis*, 547 US at 826-827 (emphasis added).

When the police questioned the victim at the gas station, there simply was no "ongoing emergency," as that term is defined by the United States Supreme Court. The prosecutor argues that the primary purpose of the interrogation was to enable police assistance to meet an "ongoing emergency"-- to find and apprehend a criminal before he injured somebody else. This argument is unpersuasive because an "ongoing emergency" in this sense would almost *always* exist while the police are investigating alleged crimes. That is, to adopt the prosecutor's argument would effectively render non-testimonial *all* statements made before the offender was placed behind bars.[14] This is clearly inconsistent with the commands

---

*Davis*, 547 US at 828. "But by the time the victim got home, her story was an account of past events," and, thus, the victim's statement to her mother was testimonial. *Id.*

[14] The dissent contends that we must consider the "length of time between [the] initial event and [the] police questioning." *Post* at 5 n 2. Presumably, the shorter the time between the event and the questioning, the more likely that the statement should be considered non-testimonial. However, the United States Supreme Court has not directed us to consider the "length of time between [the] initial event and [the] questioning." Instead, it has directed us to consider whether the statements describe an event as it is "actually happening," or whether they describe an event that has already "happened." *Davis*, 547 US at 827. If the statements fall in the former category they are to be considered non-testimonial and if they fall in the latter category they are to be considered testimonial, says the Supreme Court. *Id.* Although the dissent may refer to this as an "artificial

of the Supreme Court. See, for example, *State v Kirby*, 280 Conn 361, 385 n 19; 908 A2d 506 (2006) (explaining that "accepting the state's arguments on this point would render meaningless the distinction drawn by the United States Supreme Court, as they would render virtually any telephone report of a past violent crime in which a suspect was still at large, no matter the timing of the call, into the report of a 'public safety emergency'"); *State v Mechling*, 219 W Va 366, 377; 633 SE2d 311 (2006) ("[T]he investigation of a past crime—while necessary to prevent future harms and lead to necessary arrests—is likely to elicit testimonial statements from witnesses that will be subject to the constraints of the Confrontation Clause.") See also Fisher, *What happened—and what is happening—to the confrontation clause*, 15 J L & Policy 587, 614 (2007), which explained:

> The presence of an ongoing emergency is important only insofar as it indicates that a declarant's statement describing criminal activity can fairly be described as part of the event itself, rather than a report or a narrative of it. If the law were otherwise, statements reporting criminal activity or accusing others of crimes would always be nontestimonial until a suspect was in custody and unable to cause further harm. Even more to the point, if the law were otherwise, *Hammon* would have had to come out the other way and the Court could never have indicated that the latter part of the 911 call in *Davis* was nontestimonial [sic]. Yet the emergencies in those cases were limited to the criminal events themselves, and when those events ceased occurring, statements describing how they had transpired were testimonial.

threshold," *post* at 4, it is, for better or worse, the "threshold" set by the Supreme Court, and is thus the threshold that we must follow here.

16

Equally unpersuasive is the Court of Appeals argument that the police were "responding to an emergency" because "someone at the gas station was shot and laying on the ground." *Bryant (On Remand)*, *supra* at 3. Once again, this type of "emergency" almost *always* exists when the police respond to a victim who has been seriously injured. That is, if we were to adopt the Court of Appeals analysis, all statements made while the police are questioning a seriously injured complainant would be rendered non-testimonial, and this is also clearly inconsistent with the commands of the Supreme Court by confusing a medical emergency with the emergency circumstances of an ongoing criminal episode. See, for example, *Kirby*, 280 Conn at 384-385 ("[A]lthough the complainant might have needed emergency medical assistance at the time she made the call, the bulk of her conversation with [the police dispatcher] nevertheless consisted of her account of a crime that had happened to her in the recent past, rather than one that was happening to her at the time of the call," which "renders the telephone call recording testimonial and, therefore, inadmissible under *Crawford*"); *State v Lewis*, 235 SW3d 136, 147 (Tenn, 2007) ("Even though the victim was in a state of distress from his wounds, his comments did not describe an 'ongoing emergency,' as defined in *Crawford*, and were instead descriptions of recent, but past, criminal activity as in *Hammon*."). Most importantly, see *Davis*, 547 US at 828-829, in which the United States Supreme Court indicated that once the defendant stopped attacking the victim and "drove away from the premises," "the emergency appears to have ended." The Court said nothing at all that would

17

remotely suggest that whether the victim was in need of medical attention was in any way relevant to whether there was an "ongoing emergency." Instead, the Court said that once the criminal event was over, i.e., the defendant had stopped assaulting the victim and left the premises, the "ongoing emergency" was over at least for purposes of evaluating an alleged *Crawford* violation.[15]

The hearsay statements at issue in the instant case are significantly different from the admissible hearsay statements in *Davis*, i.e., the statements made to the 911 operator while the defendant was still attacking the victim, because, unlike in *Davis*, this victim was describing past events, rather than describing a criminal episode as it was unfolding, and, unlike in *Davis*, this victim was away from defendant and the crime scene, and was in the protection of five police officers. On the other hand, this case is significantly similar to *Hammon* because in both cases the police were seeking through their questioning to determine what had *previously* occurred, rather than what was occurring at the time of the questioning, and the victims were separated from the defendants and in the protection of the police. That is, in both *Hammon* and this case, (1) "[the] declarants were actively

---

[15] Just as *Davis* was not referring to *any* "ongoing emergency" occurring *anywhere*, see note 12 of this opinion, it was also obviously not referring to every imaginable *type* of "ongoing emergency." Instead, given that *Davis* concluded that the statements made while the victim was being assaulted *did* occur during an "ongoing emergency," but the statements made after the defendant stopped assaulting the victim and left the premises did *not* occur during an "ongoing emergency," it is clear that *Davis* used the term "ongoing emergency" in reference to the emergency presented by the pendency of the criminal event itself, not by its aftermath, including the purely medical aftermath. *Davis*, 547 US at 828-829.

separated from the defendant[s]"; (2) "[the] statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed"; and (3) "[they] took place some time after the events described were over." *Id.* at 830.[16] Here, the officers were obviously attempting to find out "what had happened in the past," as evidenced by the fact that the first question asked was "what happened." The officers were not "seeking to determine (as in *Davis*) 'what is [now] happening,' but rather 'what happened.'" *Davis*, 547 US at 829-830. Most importantly, the victim's actual statements pertained to what had happened previously, rather than to what was actually happening at the time of the interrogation. For these reasons, the victim's statements to the police were testimonial and, thus, inadmissible.

Even assuming that the error here is unpreserved because, although defendant objected to the admission of the evidence, he did not do so on the basis of the Confrontation Clause as the trial in this case took place before *Crawford*,[17] a

---

[16] Both the prosecutor and the dissent argue that the instant case is distinguishable from *Crawford* because the *Crawford* interrogation was more formal, i.e., the interrogation was tape-recorded and it took place at a police station. However, *Davis* expressly stated that the protections of the Confrontation Clause are not limited to statements made during formal interrogations. *Davis*, 547 US at 830. Further, we find it particularly telling that the three similarities between the instant case and *Hammon* that are listed directly above are the exact same three similarities that the United States Supreme Court relied on to conclude that *Hammon* is significantly similar to *Crawford*. *Id.*

[17] Before *Crawford*, as long as the hearsay statement was admissible under a "firmly rooted" hearsay exception, its admission did not violate the Confrontation Clause, *Ohio v Roberts*, 448 US 56, 66; 100 S Ct 2531; 65 L Ed 2d

reversal is required under the plain error standard. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Given that this case was pending when *Crawford* was decided, *Crawford* is applicable, *Teague v Lane*, 489 US 288, 304; 109 S Ct 1060; 103 L Ed 2d 334 (1989), and, for the reasons discussed earlier, *Crawford* was clearly violated here. That is, there was error and the error was plain.

In addition, in our judgment, the error clearly prejudiced defendant. The evidence against him was far from overwhelming and the victim's statement indicating that defendant was the one who shot him was obviously extraordinarily damaging. In fact, the prosecutor essentially conceded that the error was prejudicial when, at the suppression hearing before trial, he conceded that the admission of the victim's statements to the police is a "crucial issue to the prosecutor's case; . . . if this court rules that the excited utterance is not going to be admissible, then we won't have a trial here . . . ." In addition, during his opening

597 (1980), and the excited utterance exception is a "firmly rooted" hearsay exception, *White v Illinois*, 502 US 346, 355-356 n 8; 112 S Ct 736; 116 L Ed 2d 848 (1992). Because this was the state of the law when the trial occurred in this case, defendant's objection on the basis that the statements were not excited utterances, but not on the basis of a Confrontation Clause violation, was completely reasonable. Therefore, defendant cannot be faulted for failing to raise the Confrontation Clause issue at the trial. The prosecutor himself seems to agree:

> Given the importance of resolving this point of law to the jurisprudence of this state, the People see no reason to quibble about the adequacy of Defendant's presentation of the issue to the trial court. The trial in this matter preceded *Crawford* by more than a year, and trial counsel's motion in limine was adequate to place the admissibility of the testimony at issue.

20

statement to the jury, the prosecutor repeatedly referred to the victim's statements to the police and explained:

> The *most important piece of evidence* you will hear during this trial is [the victim] in many respects speaking to you. [The victim] will tell you that it was the defendant who shot him. Obviously he won't be here to tell you that. But before he died, the last—one of the last—probably the last thing he was able to say was that Rick shot, Rick shot me . . . . And . . . the police, all of them, heard [the victim] say Rick shot me . . . . The *most important piece of evidence* you'll hear during this trial, in other words, will be [the victim] in a certain respect speaking to you from the grave and telling you what happened in this case and telling you who's responsible. . . . All of the evidence here but *mainly* [the victim's] own words before he died point to [defendant] having pulled the trigger and having killed [the victim]. [Emphasis added.]

The prosecutor also relied heavily on the victim's statements in his closing statement to the jury, stating:

> The *main* reason we know enough about what happened to be able to decide beyond a reasonable doubt whether the charges that have been made out here, the *main* reason we know is because of [the victim's] words himself, his own words to you through those police officers in the early morning of April 29th, 2001. [Emphasis added.]

Further evidence that the error was prejudicial is the fact that defendant's first trial resulted in a hung jury. Finally, the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Carines*, 460 Mich at 763 (citation and quotation marks omitted). For these reasons, we believe that defendant is entitled to a new trial.

We also agree with defendant that the issue whether the victim's statements are admissible under the hearsay exception for dying declarations is not properly

before this Court.[18] At the preliminary examination, the prosecutor argued that the statements were admissible as either excited utterances or as dying declarations. The district court originally ruled that the statements were inadmissible because there had been no showing of the requisite factual foundation. The prosecutor then sought to establish a foundation for admission of the statements directed solely at the question whether the statements were excited utterances. At no point in the ensuing examination was the officer asked any questions concerning whether the victim expressed a belief that his death was imminent or was told that he was likely to die from his wound.[19] That is, the prosecutor clearly abandoned

---

[18] In *Crawford*, 541 US at 56 n 6, the Supreme Court recognized that "[a]lthough many dying declarations may not be testimonial, there is authority for admitting even those that clearly are." However, the Court concluded that "[w]e need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations," but "[i]f this exception must be accepted on historical grounds, it is *sui generis*." *Id.* In *Giles v California*, ___ US ___; 128 S Ct 2678, 2682; 171 L Ed 2d 488 (2008), the Supreme Court quoted *Crawford*, 541 US at 54, for the proposition that "the Confrontation Clause is 'most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.'" It then noted in dictum that one of the "forms of testimonial statements [that] were admitted at common law even though they were unconfronted" were dying declarations. *Id.*

[19] MRE 804(b) provides, in pertinent part:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

> * * *

> (2) In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that the

22

any effort to establish even a minimally sufficient foundation for the dying declaration exception, and limited his further questions exclusively to the excited utterance exception. The district court then ruled that the statements were admissible excited utterances, but did not address whether they were also dying declarations. The district court's original ruling that there was not a sufficient foundational basis to conclude that the statements were dying declarations was *never appealed* or reversed.

Indeed, the prosecutor essentially conceded during the following exchange at the pretrial conference that the victim's statements to the police were not dying declarations:

> *The Court*: I guess we have two issues ultimately, whether it comes in as a dying declaration or whether it comes in as an excited utterance. Is that where we are?
>
> *The Prosecutor*: The issue is not whether it comes in as one or the other. It came in at the [preliminary] exam clearly as an excited utterance. I think that's the way it's going to be at trial because I think there's going to be a *lack of proof on whether the deceased knew he was dying at the time*. [Emphasis added.]

In addition, at the suppression hearing, the prosecutor stated:

> [The victim], as we know, unlike what the officers knew that night, but what we know now is that [the victim] ended up dying of his injuries. He himself, [the victim], may not have known that at the time.

During the prosecutor's closing statement to the jury, the prosecutor again said:

---

declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death.

> [The victim] ended up dying several hours later.  We don't
> know whether he knew that at the time he said this . . . .

Because a dying declaration must be made while the declarant believes his death

to be imminent, and the prosecutor stated that there is a "lack of proof on whether

the deceased knew he was dying at the time," the prosecutor seems to have

conceded that the victim's statements were not dying declarations.[20]

The circuit court also believed that the prosecutor had abandoned the dying

declarations issue when, in response to defendant's request that the prosecutor

---

[20]  The dissent contends, "The statements in this case seem admissible as dying declarations, thus potentially obviating much of the majority's analysis." *Post* at 2.  We must point out initially that the United States Supreme Court has not yet held that dying declarations are admissible under *Crawford*.  More significantly, however, and contrary to the dissent's contention, the prosecutor did more than merely fail to "establish[] the requisite foundation for a dying declaration," *post* at 9 n 5; rather, he failed to appeal the district court's decision that the statement was not a dying declaration, and he explicitly conceded that there is a "lack of proof on whether the deceased knew he was dying at the time." In addition, even after *Crawford* and *Davis* were decided, the prosecutor still did not raise the dying declarations issue either with the Court of Appeals or with this Court until after this Court granted leave to appeal.  On the other hand, defendant consistently argued that the victim's statements were inadmissible and that they were not dying declarations.  In fact, when the district court ruled that the victim's statements were admissible, defendant asked the district court to clarify whether they were admissible as dying declarations or as excited utterances.  In addition, during the trial, defendant asked the circuit court to ensure that the prosecutor refrain from referring to the victim's statements as the "dying victim's statements."  While defendant did everything he could to ensure that the victim's statements were not admitted as dying declarations, the prosecutor did nothing equivalent to seek admission of the statements as dying declarations, and essentially conceded that the statements were *not* dying declarations.  Therefore, to answer the dissent's question, *post* at 11, this is why we do "not [now] give the parties the same consideration" with regard to this issue.

refrain from referring to the victim's statements as the *dying* victim's statements during closing arguments, the circuit court stated:

> I think maybe based upon an attorney's knowledge of the difference between dying declaration[s] and excited utterance[s], dying declarations have a[] [greater] aura [of] reliability than excited utterances. This was not a dying declaration. It did not come in as a dying declaration, and I'm going to agree with Defense counsel on this one. That should not be characterized as, he lay there dying. . . . That's pure supposition.

The prosecutor did not contest the circuit court's ruling that the victim's statement was not a dying declaration. In fact, during his closing argument, the prosecutor told the jury that the victim's statements to the police were admissible under the excited utterance exception to the hearsay rule; the prosecutor did not refer to the dying declaration exception. Finally, the prosecutor did not raise this issue in the Court of Appeals or this Court until after this Court granted leave to appeal limited to the issue whether the victim's statements constituted testimonial hearsay under *Crawford* and *Davis.* Accordingly, the prosecutor has either effectively conceded that the victim's statements did not constitute a dying declaration or, at the very least, has abandoned this issue. See *Gross v Gen Motors Corp*, 448 Mich 147, 162 n 8; 528 NW2d 707 (1995) (stating that "[w]hen a cause of action is presented for appellate review, a party is bound to the theory on which the cause was prosecuted or defended in the court below" and "[f]ailure to properly brief an issue on appeal constitutes abandonment of the question").

25

## IV. CONCLUSION

Because the victim's statements to the police were inadmissible testimonial hearsay statements pursuant to *Crawford* and *Davis*, and the admission of the statements constituted plain error requiring reversal, we reverse the Court of Appeals and remand this case for a new trial.

Stephen J. Markman
Marilyn Kelly
Michael F. Cavanagh
Diane M. Hathaway

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                                                    No. 133725

RICHARD PERRY BRYANT,

      Defendant-Appellant.

_____

      WEAVER, J. (*dissenting*).  I dissent from this Court's decision to reverse the Court of Appeals and remand for a new trial.  I would affirm the judgment of the Court of Appeals for the reasons stated in its unpublished opinion on remand, specifically, that the declarant's statements were made in the course of a police interrogation under circumstances objectively indicating that the interrogation's primary purpose was to enable police assistance in an ongoing emergency.

                                          Elizabeth A. Weaver

      .

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                   No. 133725

RICHARD PERRY BRYANT,

     Defendant-Appellant.

_____

CORRIGAN, J. (*dissenting*).

     I respectfully dissent. The Court of Appeals reasonably concluded that the victim's statements—made within a half-hour of being shot while he lay bleeding in a parking lot—were non-testimonial for Confrontation Clause purposes because they were elicited by police officers addressing an ongoing emergency. Further, I question the majority's treatment of *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004), and *Davis v Washington*, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006), as conclusive regarding the admissibility of the victim's statements under these facts, where, although the victim's statements were likely also dying declarations, the prosecution abandoned this argument in the lower courts. The statements likely would have qualified for admission *both* as excited utterances and as dying declarations but, under then-existing law, the prosecution needed only to advocate for admission under one theory. It chose the former. After the trial, however, the United States Supreme Court established new

Confrontation Clause standards in *Crawford* and further suggested that dying declarations might prove a rare exception to the new rule. The statements in this case seem admissible as dying declarations, thus potentially obviating much of the majority's analysis. Accordingly, the majority's opinion—which reverses a number of close calls made by the Court of Appeals in this highly fact-specific case—exemplifies the adage that "bad facts make bad law." For these reasons, I would affirm defendant's convictions.

As recounted in the majority opinion, police officers arrived at a Detroit gas station at 3:25 a.m. within minutes after receiving a report of a shooting. It appears that they did not know how long ago the shooting had occurred, where it took place, or whether the shooter was at the gas station. They found the gunshot victim lying on the ground, bleeding, visibly in pain, and having trouble talking. They asked him what happened. He reported that defendant shot him about 3:00 a.m. at a residence six blocks away. The majority concludes that the primary purpose of the officers' questions "was to establish the facts of an event that had *already* occurred," not to "enable police assistance to meet an ongoing emergency." *Ante* at 11. But the majority considers the facts in hindsight, rather than with an objective view of the circumstances at the time the statements were made. The United States Supreme Court's opinion in *Davis* clearly establishes that the statements must be viewed through an objective assessment of the circumstances surrounding them: "Statements are nontestimonial when made in the course of police interrogation under circumstances *objectively indicating* that

the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822 (emphasis added); and see *Crawford*, *supra* at 52 (emphasis added; citations omitted) (statements have been characterized as testimonial if they "'were made under circumstances which would lead an *objective witness* reasonably to believe that the statement would be available for use at a later trial'").

First, the majority assumes too much when it concludes that there was no ongoing emergency because the shooting necessarily occurred 30 minutes earlier. Rather, it is more likely that experienced officers would not take the victim's time estimate so literally as to summarily conclude that they, the victim, and the public were out of danger. The officers themselves reported that the victim was visibly in pain and having trouble talking; I cannot imagine that they trusted him to have looked at his watch the moment after he was shot. Further, even at trial a precise time was never established; indeed, the victim's brother testified that he heard shots between 3:00 and 3:30 a.m.

In any event, even if we assume that the reported shooting occurred a full 25 minutes earlier at 3:00 a.m., this time lapse certainly does not prohibit as a matter of law the conclusion of the Court of Appeals that an emergency was ongoing. Rather, the officers knew that an armed assailant had been within six blocks of their location. They could not be sure that the assailant would not harm

3

others or pursue the victim.[1]  One could reasonably conclude that the assailant posed an immediate, continuing danger.  Therefore, even if we assume that about 30 minutes had passed, this case does not become automatically comparable to cases such as *Crawford*, where police questioned the declarant at the police station "hours after" the relevant events occurred.  See *Davis*, *supra* at 827.

Contrary to the majority's assertions, *ante* at 18 n 15, *Davis* does not establish an artificial threshold after which all questions are assumed to be for purposes of retrospective investigation and all statements in response are presumed testimonial.  The semantic difference between what is "actually happening" and what has already "happened" is not so simple when applied to the real world, where context controls which legal labels most aptly apply.  The amount of time that has elapsed between the onset of an emergency and statements about that emergency clearly must be considered in context.[2]

---

[1] The majority concludes that the officers did not subjectively perceive an ongoing emergency because they did not testify, for example, about "taking any actions to secure the area, to search the station for the possible presence of any armed individuals, or to provide cover for other officers."  See *ante* at 12-14.  I am wary of the majority's speculation concerning police procedures, particularly because these officers testified before the United States Supreme Court decided *Crawford* or *Davis*.  Therefore, the officers were not questioned to elicit their goals in questioning the victim or whether and how they had already determined that the shooter was not in the immediate area.  In any event, the majority's reference to the officers' *later* call for backup assistance, *ante* at 14, cuts against the majority's conclusion; the officers' fear that defendant remained armed and dangerous confirms that their attempts to identify him and his location by questioning the victim were related to potential ongoing danger.

[2] Further, the Court of Appeals conclusion that the emergency was ongoing here does not require us to conclude that an emergency is ongoing any time police

4

For similar reasons, I disagree with the majority's presumption that the victim's statements were not made during an ongoing emergency as a matter of law because the victim had escaped to the gas station. A mere distance in space between an initial event and the ensuing statements by a victim is not dispositive. Neither *Davis* nor *Crawford* states a bright-line rule establishing that an emergency ends the moment the assailant and victim are physically separated to any extent. Instead, clearly the nature of the initial assault, including the type of weapon used, affects whether an objective victim or police officer would conclude that the threat has ended, as I discuss further *infra* when I address the facts of *Hammon*, the companion case of *Davis*.[3] Indeed, as the majority acknowledges, *ante* at 14 n 12, there may have been an ongoing emergency originating from defendant's house. There is no principled reason to conclude *as a matter of law* that the officers' questions and the victim's statements were unrelated to, or did

_____

seek to "apprehend a criminal before he might injure somebody else," thereby "effectively render[ing] non-testimonial *all* statements made before the offender was placed behind bars." *Ante* at 15. Rather, clearly the overall circumstances of the statements must control the court's determination whether the emergency was truly ongoing. The majority inappropriately takes the Court of Appeals analysis to its logical extreme instead of accepting the simple proposition that a length of time between an initial event and police questioning is a factor relevant to whether the emergency is ongoing; some lapse of time does not require the automatic conclusion that an objective observer would perceive the emergency as having ended.

[3] I do not assert that "if there is an 'ongoing emergency' *anywhere* (or even what the police *perceived* to be such an "ongoing emergency"), a victim's statements to the police are to be considered non-testimonial . . . ." *Ante* at 14 n 12. Rather, I simply conclude that any apparent distance must be viewed in context.

5

not constitute a part of, that emergency merely on the basis of a distance of six blocks.[4]

For these reasons, I cannot join the majority's conclusion that the victim's statements "related solely to events that had occurred in the past . . . ." *Ante* at 10. Rather, as in *Davis*, *supra* at 827, "the nature of what was asked and answered . . . was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." Accordingly, I also disagree with the majority's comparison of this case to *Hammon*. There, the police spoke to the domestic violence victim while she sat on her front porch. She stated that the defendant had "hit" and "thrown" her. The defendant was inside the house. *Davis*, *supra* at 830. The Court reasonably determined that the victim was no longer in danger because she was protected by the police. *Id.* at 831. Further, because she suffered physical abuse but did not report that her assailant used a gun or that others were in danger inside the home, the prospect of continuing immediate danger to the victim, the officers, or the public was negligible. In contrast, the evidence here much more strongly suggests that an emergency was in progress and that the officers sought to determine "'what

---

[4] Indeed, my disagreement with the majority centers on my conclusion that we should not reverse this case as a matter of law simply because the victim and the assailant were separated in some way where the Court of Appeals reached a supportable conclusion based on all the underlying facts. Whether the victim and the assailant are separated by a door (as in *Hammon*), by one block, by six blocks, or by ten blocks, the nature and persistence of the relevant emergency depend on the circumstances, including the type of danger or assault involved and the continued vulnerability of the victim (or others, when relevant) to further danger.

is happening,'" not simply "'what happened.'" *Id.* at 830. Indeed, a gunman was on the loose. The officers did not know his location or whether he remained a threat. Thus, I cannot agree that the officers primarily questioned the victim "to investigate a past crime," *ante* at 14, or to "establish or prove past events potentially relevant to later criminal prosecution," *Davis*, *supra* at 822, as in *Crawford* and *Hammon*. *Ante* at 2, 15.

This case seems to fall midway on a spectrum between the facts of *Crawford* and those of *Davis*. As the *Davis* Court explained, in *Davis* the 911 caller "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events.'" *Davis*, *supra* at 827 (emphasis and punctuation in original), quoting *Lilly v Virginia*, 527 US 116, 137; 119 S Ct 1887; 144 L Ed 2d 117 (1999) (plurality opinion). The call was "plainly a call for help against [a] bona fide physical threat," and

> the nature of what was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [*Davis*, *supra* at 827.]

In *Crawford*, in contrast, the declarant's statements were made during questioning at the police station that took place "hours after the events she described had occurred." *Davis*, *supra* at 827. The *Davis* Court also described the "striking" difference in the "level of formality between the two interviews." *Id.* The declarant in *Crawford* was "responding calmly, at the station house, to a series of

questions, with the officer-interrogator taping and making notes of her answers." *Id.* The declarant in *Davis*, on the other hand, provided "frantic answers . . . over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id.*

I agree with the majority that this case is not precisely comparable to *Davis* because, here, the victim was not facing an immediate physical threat from an assailant, and the police had arrived on the scene. But this case is also by no means directly comparable to *Crawford* because, here, the shooting had just occurred, the statements were made only blocks away from the crime, the victim was in pain from untreated wounds that would soon prove to be fatal and was having trouble talking, and it was uncertain whether he, the police, or the public were out of physical danger. For these reasons, I conclude that this case is more similar to *Davis* than to *Crawford.* And, most significantly, to the extent this case's location on the spectrum presents a close question, the Court of Appeals did not clearly err when it concluded that the emergency was ongoing and the victim's statements were non-testimonial.

Finally, the majority's decision is clouded by the prosecution's abandonment of its original argument that the victim's statements were dying declarations. The majority reasonably concludes that the prosecution abandoned this argument, which it raised only at the preliminary examination, by continuing to advance only its alternative theory that the victim's statements were excited

utterances.[5] This was a reasonable strategy at the time this trial took place. As the majority observes, before the United States Supreme Court issued *Crawford*, hearsay statements admissible under a "firmly rooted hearsay exception"—including "excited utterances" or "spontaneous declarations"—did not violate the Confrontation Clause. *Ante* at 19 n 17, citing *Ohio v Roberts*, 448 US 56, 66; 100 S Ct 2531; 65 L Ed 2d 597 (1980), and *White v Illinois*, 502 US 346, 355-356 n 8; 112 S Ct 736; 116 L Ed 2d 848 (1992). *Crawford* and *Giles v California*, ___ US ___; 128 S Ct 2678; 171 L Ed 2d 488 (2008), have subsequently suggested that dying declarations—*but not some or all excited utterances*—may remain admissible under *Crawford*, although unconfronted, because the dying declaration is an historical exception to hearsay rules that predated the Confrontation Clause. *Giles*, *supra* at ___, 128 S Ct at 2682; *Crawford*, *supra* at 56 n 6, 58 n 8; and see the majority's discussion *ante* at 9 n 6, 22 n 18. The victim's statements here seem to qualify as dying declarations. He had been shot in the stomach at most 25

---

[5] I disagree with the majority's secondary conclusion that the prosecution necessarily conceded that the statements were *not* dying declarations. See *ante* at 25. The prosecution did pursue only the excited utterance theory and admittedly never established the requisite foundation for a dying declaration. But I am not convinced that the prosecution's statement—that there was a "lack of proof on whether the deceased knew he was dying at the time"—constituted a concession that the victim's statements could never be considered dying declarations. See *ante* at 24 n 20. The prosecution may have been admitting only that it could not support an argument on this point because it had not chosen to undertake the potentially difficult task of establishing the requisite proofs. In any event, the prosecution's failures in these regards exemplify my primary concern: that the majority here creates bad law from bad facts resulting from the incomplete nature of the record.

minutes before he spoke to the officers. He was lying on the ground, bleeding, in pain, and having trouble speaking. He had not yet received medical attention. He died a few hours later. Accordingly, his statements likely would have qualified as "statement[s] made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." MRE 804(b). Although the prosecution chose not to establish a circumstantial foundation for the applicability of MRE 804(b), opting instead to advance the equally useful argument that the statements were excited utterances, the prosecution may well have successfully done so had this trial occurred *after* the release of *Crawford* when the import of dying declarations as exceptions to the Confrontation Clause became apparent. Then, if dying declarations prove to be accepted as historical exceptions to the Confrontation Clause, we would have no reason to resolve the close question here concerning whether the victim's statements were also made in the course of an ongoing emergency.

Therefore, I question the majority's decision to rest its precedential analysis of *Crawford* and *Davis* on a fact-intensive Court of Appeals decision that does not even consider the legal argument that is arguably most relevant to the outcome of this case post-*Crawford.* Moreover, the majority acknowledges that defendant should not be faulted for failing to raise the Confrontation Clause issue at trial because *Crawford* had yet to be decided. *Ante* at 20 n 17. Yet it fails to give the same consideration to the prosecution, which had equally little reason to presume

10

that its choice between two formerly equal theories for admission would become decisive on the basis of later-decided law. Even if the prosecution entirely abandoned its argument, why should we not give the parties the same consideration in light of the intervening changes in the law? At a minimum, I would not analyze the Confrontation Clause issue on the basis of the victim's excited utterances under these facts; in my view, if the prosecution had not abandoned its attempt to classify the statements as dying declarations, we likely would not have to reach the contentious question whether there was also an ongoing emergency under *Crawford* and *Davis*.

In conclusion, the Court of Appeals did not clearly err when it decided that the victim's statements were admissible because they were non-testimonial under *Crawford* and *Davis*. Further, particularly because the appeals panel made reasonable, close calls in answering the fact-intensive questions presented, I would not reverse its decision where the statements were also likely dying declarations that would be excepted from the rule of *Crawford*. Accordingly, I would affirm.

Maura D. Corrigan
Robert P. Young, Jr.
